# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| TAMMY O'CONNOR AND MICHAEL STEWART, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| ATHERIO, INC., JASON CORY, GREG FURST, MARK DINKEL, THOMAS FOREST FARB, TRACI CORY, C. TAYLOR PICKETT, FRANK D'ANGELO, AND EDWARD PERRY, | § § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Tammy O'Connor ("O'Connor") and Michael Stewart ("Stewart") ("collectively, "Plaintiffs") by and through their attorneys of record, bring this Original Complaint, alleging that Defendants Atherio, Inc. ("Atherio"), Jason Cory ("Cory"), Greg Furst ("Furst"), Mark Dinkel ("Dinkel"), Thomas Forest Farb ("Farb"), Traci Cory, C. Taylor Pickett ("Pickett"), Frank D'Angelo ("D'Angelo"), and Edward Perry ("Perry") breached a contract with Plaintiffs and engaged in numerous counts of wrongful conduct including but not limited to breach of fiduciary duty and securities law violations, as more specifically pled herein.  In support thereof, Plaintiffs respectfully show the Court the following:

## I.
### INTRODUCTION AND SUMMARY

1.      Defendants defrauded Plaintiffs into selling their company, Red River Solutions, LLC ("Red River"), which was organized and profitable when Plaintiffs ran the company. Defendant Atherio intentionally refused to disclose to Plaintiffs the resignation of one or more key Atherio officers that occurred on the eve of closing between Atherio and Red River.

By Atherio's own admissions, knowledge by Plaintiffs of such resignation(s) would "keep the closing from happening" and "prevent the closing" of the sale. Yet, Defendants intentionally failed to disclose these critical facts to Plaintiffs. Further, as Chief Executive Officer of Atherio, Cory embezzled money from Atherio, paid himself extra commissions, used company funds to pay for personal expenses, fraudulently filled out loan documents in likely violation of federal law, and failed to maintain commercially reasonable books and records. Unfortunately for Plaintiffs, none of the aforementioned conduct was ever disclosed to them until it was too late. Defendants tricked Plaintiffs into selling Red River by not disclosing key and material facts, took that company without paying Plaintiffs the amounts promised, and proceeded to run Plaintiffs' company into the ground. Defendants should be held accountable for their improper and wrongful conduct.

## II.
### PARTIES

2.      Plaintiff O'Connor is an individual who is a citizen of the State of Texas.

3.      Plaintiff Stewart is an individual who is a citizen of the State of Texas.

4.      Defendant Atherio is a Delaware corporation with a principal place of business at 6701 Democracy Blvd., Suite 300, Bethesda, Maryland 20817. Atherio can be served with process by serving its registered agent, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

5.      Defendant Cory, an individual and citizen of the State of Florida, is the Chief Executive Officer of CorSys Technology Group, Inc. ("Corsys") and former Chief Executive Officer of Atherio. He may be served with process at 299 Saint Johns Forest Blvd., Saint Johns, Florida 33259-4073.

6.      Defendant Furst, an individual and citizen of the State of Maryland, is the current Chief Executive Officer of Atherio. He can be served at 6701 Democracy Blvd., Suite 300,

Bethesda, Maryland 20817.

7.      Defendant Dinkel, an individual and citizen of the state of California, was a Director of Atherio.  He may be served with process at his place of work at Presidio, Inc., 900 Hopyard Rd., Ste. 282, Pleasanton, CA 94588.

8.      Defendant Farb, an individual and citizen of the State of Florida, was a Director of Atherio.  He may be served with process at 76 S. Laura St., Ste. 1702, Jacksonville, FL 32204.

9.      Defendant Traci Cory is an individual and citizen of the State of Florida.  She may be served with process at 299 Saint Johns Forest Blvd., Saint Johns, FL 33259.

10.     Defendant Pickett, an individual and citizen of the State of Maryland, is a Director of Atherio.  He may be served with process at 6701 Democracy Blvd., Ste. 345, Bethesda, MD 20817.

11.     Defendant D'Angelo, an individual and citizen of the State of Maryland, is a Director of Atherio.  He may be served with process at 6701 Democracy Blvd., Ste. 345, Bethesda, MD 20817.

12.     Defendant Perry, an individual and citizen of the State of Maryland, is a Director of Atherio.  He may be served with process at 6701 Democracy Blvd., Ste. 345, Bethesda, MD 20817.

## III.
### JURISDICTION

13.     This Court has federal question jurisdiction over this lawsuit under 28 U.S.C. § 1331 pursuant to Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and 17 CFR § 240.10b-5 because the matters in controversy arise under the laws and rules of the United States.  This Court has diversity jurisdiction over this lawsuit under 28 U.S.C. § 1332(a) because the parties to the lawsuit are citizens of different States.  Further, this Court has supplemental

jurisdiction under 28 U.S.C. § 1367(a) over the state-law causes of action asserted herein because they form part of the same case or controversy as the claims within the original jurisdiction of this Court.

## IV.
### VENUE

14.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Northern District of Texas. In addition, this dispute concerns a contract in which the parties contractually agreed to jurisdiction and venue in this judicial district.

## V.
### FACTS

**A.     Red River Solutions, LLC and Atherio**

15.     Plaintiffs are the founders and former owners of Red River, which provides industry and business process improvements and information technology assessments within organizations.

16.     In 2012, Atherio's then-Chief Executive Officer, Cory, pitched Atherio's plan to Plaintiffs wherein Atherio would acquire three companies: Red River and two, yet-to-be-named companies in an effort to position Atherio as a "global Information Technology & Business Process services company differentiated in the market through a maniacal focus on client satisfaction and domain expertise." Atherio represented to Plaintiffs that it had already signed letters of intent with respect to the two other companies.

17.     According to Atherio, the company acquisitions would "immediately provide a competitive advantage" over Atherio's competitors. To further induce Plaintiffs to sell Red River, Atherio further represented that the company acquisitions would:

- "create a global Information Technology & Business Process services company differentiated in the market through a maniacal focus on client satisfaction and domain

expertise"

- "[d]rive increased EBITDA through synergies; [m]aniacal focus on customer satisfaction"

- [enable] "[p]rogrammatic approach to cross selling into merged client base"

- [enable an] "'Everyone Sells' program to drive new revenues"

- [enable] "[o]perations in lower cost geographies"

- [enable] "[d]elivery based on CLIENTS wants/needs"

- "identify & deliver superior technology, process & resources through flexible global delivery models"

- [enable] "[p]rofessional services & expertise"

- [yield] "[v]alue to our clients"

- [erect] "[s]trategically located facilities that deliver enterprise value through cost, quality of service, and reliability in a flexible global delivery model."

**B.    Additional representations made to Plaintiffs for purposes of inducing them to sell Red River to Atherio**

18.    Further, Atherio represented to Plaintiffs that upon the acquisition of the three companies, the value of Atherio would equal $77.6 million and the estimated value of Red River would be $23 million.

19.    To induce Plaintiffs to sell Red River and as discussed more fully below, Atherio offered Plaintiffs monetary consideration, $1.5 million in Earn-Out Payments, and shares of Atherio stock that, according to Atherio, would be worth $19 million in 2016.

20.    Atherio also made specific representations to Plaintiffs about the quality of its executive leadership team: Cory, who served as Atherio's CEO; Furst, Atherio's Chief Operating Officer and Chief Revenue Officer at the time; Dinkel, Chief Administrative Officer and General Counsel; and Farb, Atherio's Executive Vice President and Chief Financial Officer). For example, Atherio represented to Plaintiffs that prior to becoming CEO of Atherio, Cory "served as Senior Vice President, President, and Division Executive for Global Services at Fidelity Information Services"; before that, was "Vice President & Global Portfolio Executive with Computer Sciences

Corporation"; was "Executive Director and Partner in Unisys' Global Outsourcing and Infrastructure business"; "held leadership and executive roles at SAWIS, Anheuser-Busch, and in the United States Army"; and holds a "Bachelor of Computer Science in Information Technology, and a Master of Business Administration."

21.     Based on Atherio's representations and in reliance on the purported experience and wherewithal of Atherio's executive team, Plaintiffs agreed in principle to sell Red River to Atherio. Subsequent to this agreement in principle, Plaintiffs and Atherio began working on the details of the purchase.

**C.     Atherio's intentional efforts to avoid disclosing material facts on the eve of closing**

22.     By late June 2013, the parties were on the eve of closing the deal. At 8:40 a.m. on June 25, 2013, Farb sent an email to Cory and Furst wherein he wrote, "I am reminding you that I have resigned from Atherio per the attached letter supplied to you previously and am again supplying it to you as of this date as an attachment."

23.     No one from Atherio disclosed Farb's resignation to Plaintiffs. Instead, Plaintiffs learned of Farb's resignation after Atherio produced documents in November 2015 pursuant to a pre-suit deposition taken in a Texas state court proceeding.

24.     Cory recognized the fact that Farb's resignation and Atherio's intentional efforts to avoid disclosure of that resignation could derail the closing of the Red River acquisition. Copying Furst and Dinkel on his email, Cory wrote to Farb on June 25, 2013, "If you want to keep the closing from happening you probably can."

25.     In other words, Atherio recognized that the last-minute resignation of a key executive was a crucial fact that, if known by Plaintiffs, would warn them not to commence with the closing of the sale of their company. So, the Atherio executives intentionally hid this fact.

26.     Even Farb, who had already resigned, reassured Atherio, "I don't plan to prevent the Close."

27.     Thus, the closing occurred and Atherio acquired Red River by executing with Plaintiffs a Membership Interest Purchase and Contribution Agreement (the "Purchase Agreement"), dated June 25, 2013—the very day Atherio intentionally hid from Plaintiffs the information about Farb's resignation.

28.     Pursuant to the Purchase Agreement, Plaintiffs transferred all their membership interests in Red River to Atherio in exchange for (1) cash payments; (2) the Earn-Out Payments, which would constitute additional compensation that would be earned if specific performance targets were met during specified earn-out periods; and (3) the $19 million in Atherio stock.

29.     The Purchase Agreement also requires Atherio to maintain separate and commercially reasonable books and records relating to the necessary and appropriate elements of EBITDA, and to permit Plaintiffs to access those books and records. The Purchase Agreement also requires Atherio to "operate the Business in such a manner, and with such policies, procedures, personnel and other resources as is commercially reasonable to maximize EBITDA and the opportunity for the Earn-Out Payments …" and recognizes an explicit covenant of good faith and fair dealing with respect to the earn-out payments.

**D.     Subordination Agreement**

30.     In connection with the Purchase Agreement, Atherio incurred certain indebtedness to Prudent Capital II, LP ("Prudent"), and Plaintiffs executed a "Subordination Agreement" in favor of Prudent. Prudent was required to exercise its rights under the Subordination Agreement in accordance with the implied covenant of good faith and fair dealing.

31.     Furthermore, to secure Atherio's indebtedness to Prudent, Cory, Atherio's then-

Chief Executive Officer, pledged 100 percent of the stock he owned in Atherio to Prudent (Cory's stock constituted approximately 56 percent ownership of Atherio).

**E.     Accounting issues and mismanagement at Atherio**

32.     Upon Atherio's purchase of Red River and in accordance with the Purchase Agreement, Plaintiffs became shareholders and employees of Atherio. During the time in which Plaintiffs owned Red River, the company was agile, organized, and profitable. Plaintiffs worked very hard to bring in important clients and satisfy them—which is why Red River was so profitable and appealing to Atherio. However, almost immediately after Atherio's purchase of Red River, Plaintiffs began to learn of Atherio's numerous accounting issues and disorganization—none of which were disclosed to Plaintiffs prior to Atherio's acquisition of Red River.

33.     Within six months of being a part of Atherio, Plaintiffs learned that Atherio was not juxtaposed to be the "global Information Technology & Business Process" juggernaut, as the Atherio principals represented to Plaintiffs to induce them to sell their company. To the contrary, Atherio was losing revenue and operating at losses. Moreover, Atherio did not "focus on client satisfaction" and had none of the "domain expertise" represented to Plaintiffs by Atherio. Further, the clients Plaintiffs worked so hard to obtain and keep were now fleeing Atherio due to Atherio's inability to service them. Simply put, Plaintiffs had no knowledge that Atherio was a sinking ship until it was too late. The Atherio principals successfully kept all this material information about what Atherio could not do (which was a lot) hidden from Plaintiffs until they signed their company away.

**F.     Cory embezzled money from Atherio**

34.     By way of information and belief, in late 2013, Atherio executives uncovered evidence that Cory was embezzling money from Atherio. During the week of Red River's

Christmas party in Dallas, Texas and by way of information and belief, Cory and/or his wife, Tracy Cory—who was also an employee of Atherio—personally picked up from the Dallas office checks to deposit into the Atherio/Red River bank account. But the checks were never deposited into the Atherio/Red River account. Instead, by way of information and belief, Cory used the money for his own personal use.

## G.     Atherio's precarious situation devolves into a perilous one

35.     By the beginning of 2014, Atherio's accountant, Irene Picca, distressed by the ongoing accounting and management crises within Atherio, wrote an open letter to the company. In that letter, she wrote, "The chaos of where we are today stems from the leadership style to which we have been subjected." "Expenditures were made without any form of communication with me as the accounting department," she stated. "When I routinely objected, I was mollified with a few bills or receipts emailed to me." Ms. Picca wrote further, "I was forced to look on the online banking at every check in order to classify it. I asked ad nauseum for the [Red River Solutions] acquisition documents and was never given enough information to post a correct balance sheet." Ms. Picca proceeded, "I became concerned with the growing number of undocumented transactions and the lack of procedures or policy in place to control spending. I have had frequent email battles with Jason Cory over the controls I kept requesting."

36.     Ms. Picca wrote that she has expressed the following concerns to each new financial officer and controller without response:

- There are no controls in place to safeguard corporate assets; money is spent without any requests.
- The CEO [Cory] ignores my request that every expenditure must be requested before expensing funds.
- I have asked the Financial Officer to remove the [Atherio] bank cards from Jason Cory for the sake of avoiding investor lawsuits.

37.     She stated further, "[e]very corporate 'normal control' activity is turned aside to

accommodate the urgencies created by the lack of order resulting from disregarded procedures. Haphazard plans are devised and then not followed through. Decisions are made with little consultation of the related professionals."

**H.    Cory misused company funds and procured illegitimate commissions**

38.    Cory bilked Atherio out of thousands of dollars and personally benefited from his deception. For instance, Cory had a bogus invoice drawn up so that he could bill Atherio $10,000. The invoice, back-dated to September 1, 2013, was issued to Atherio from "Jason Cory's Company." Cory sent himself an email with his notes regarding the fake invoice around the time the invoice was created in November 2013. In that email, Cory wrote, "Isn't it bad to have the title of the company say Jason Cory's Company?" Cory's notes further expressed his desire to characterize the money not as a commission but as a management bonus to be paid by to him by Atherio. By way of information and belief, Atherio paid to Cory the invoiced amount of $10,000.

39.    In January 2014, Irene Picca, the accountant who Cory strong-armed into creating the invoice, blew the whistle on Cory by sending an open letter to Atherio wherein she wrote, among other things, that Cory took $10,000 and called it a commission.

40.    Ms. Picca's letter also revealed more of Cory's wrongful and illegal conduct. She wrote:

- I recognized personal expenditures in the form of child support payments and two mortgage payments with corporate funds.

- Money is spent without order from five different accounts: Mastercard, American Express, and three checking accounts.

- The bank statement has displayed repeated unauthorized ATM withdrawals.

- $10,000 checks have been issued and recharacterized as wages.

- I personally traced a check transferred out of [Atherio Investments, LLC] to an outside bank account that was identified as a bank account of the CEO [Cory].

41.    Prudent sent a letter to Atherio and Red River wherein it acknowledged that Cory

obtained an additional $10,000 "commission" that was outside of his intended compensation.

42.    Prudent's letter to Atherio also noted that Cory amassed "illegitimate and unreasonable travel and entertainment expenses" for himself and his family members and charged these expenses to Atherio.

43.    In February 2014, Furst sent John Martin ("Martin"), Atherio's current Chief Administrative Officer, an email wherein he told Martin that he should go through Cory's company-issued Mastercard, look at the recurring charges on the company credit card, and "flush out what is business and what isn't."

44.    Furst pointed out to Martin some of Cory's obviously inappropriate and personal expenses charged to the company credit card including but not limited to a monthly subscription to Hulu, a television streaming service which allows users to watch some of their favorite television shows online; Angie's List, a paid subscription supported website containing crowd-sourced reviews of local businesses; Learn Language, an online service that teaches its user to speak a foreign language (in this case, Spanish); and a monthly bill from AT&T to pay for his personal home phone.

## I.    Cory fraudulently filled out loan documents

45.    As Atherio CEO, Cory obtained financing for the Red River acquisition from two lenders: a senior lender, Sun Trust Bank, and Prudent, its mezzanine lender.  As part of the loan from Sun Trust Bank to Atherio, Atherio was required to fill out borrowing base certificates so that Sun Trust could determine Atherio's borrowing base—the value assigned to a collection of Atherio's assets used by the bank to determine the loan amount. In November or December 2013, Cory fraudulently modified the Sun Trust Bank borrowing base certificates, thus enabling Atherio to impermissibly obtain more money from the bank. In a November 2015 deposition, Furst

admitted, "[i]t appeared at the time that Jason had modified our borrowing base certificate."

**J.      Atherio gives Cory an Atherio client and pays him to go away despite its knowledge of Cory's wrongdoing**

46.      Furst stated in an email to Martin that Cory's wrongful and illegal conduct "is bigger and more pervasive than we even thought earlier today."  Furst went on to state that Cory needs to be locked out and removed from Atherio.  For his part, Martin believed the allegations made against Cory to be true.

47.      Accordingly, on January 31, 2014, Atherio's Board of Directors passed a Resolution acknowledging allegations of Cory's "improprieties and/or wrongful conduct," including without limitation, the "misuse of funds of [Atherio] and/or one or more of its Subsidiaries."  That Resolution states, in pertinent part, as follows:

> WHEREAS, one or more members of the Board of Directors have recently been placed on notice of allegations of improprieties and/or wrongful conduct (the "Allegations") of the Chief Executive Officer of the Corporation, Jason M. Cory ("Cory"), including without limitation, (a) misuse of funds of the Corporation and/or one or more of its Subsidiaries, inclusive of (i) documented expenses reimbursed by and through documentation intended to mislead that such expenses were business expenses when, in fact, such expenses were to compensate for personal use or purposes, and/or (ii) reimbursement of undocumented expenses for business purposes when, in fact, such purposes were not business related, but were rather for personal use or purposes, (b) additional violations of the (i) Loan Documents, as that term is defined in that certain Credit Agreement, made and entered into as of May 29, 2013 (the "Credit Agreement") by and between the Corporation and SunTrust Bank ("SunTrust"), and (ii) Investment Documents, as that term is defined in that certain Investment Agreement, dated June 25, 2013 (the "Investment Agreement"), by and between, among others, the Corporation and Prudent Capital II, LP ("Prudent") (as further used herein, the Credit Agreement and the Investment Agreement are collectively referred to as the "Debt Instruments," and SunTrust and Prudent are collectively referred to as the "Lenders"), (c) irregularities in respect of the preparation and submission of certifications and/or other reporting requirements provided under the Debt Instruments to the Lenders, and/or (d) violation of Cory's

Amended and Restated Executive Employment Agreement, dated June 25, 2013 (the "Employment Agreement");

WHEREAS, the source(s) of such Allegations are one or more shareholders of the Corporation, outside accounting personnel, internal accounting personnel, one or more former employees, and preliminary due diligence of the Allegations conducted by certain officers and/or employees of the Corporation…

48.     Yet, astonishingly, after uncovering evidence of Cory's wrongful and illegal conduct, Atherio did not fire Cory. Atherio did not file criminal charges against Cory. In fact, Atherio was careful not to even arrive at a formal conclusion as to Cory's wrongful and illegal conduct; even though Furst's and Martin's own admissions clearly establish their belief as to Cory's guilt.

49.     Instead, nearly half a year after the passage of the above-mentioned Board Resolution, Atherio promised to pay Cory $160,000 for his departure from Atherio. In addition, Atherio assigned to Cory $350,000 of the accounts receivable from Sports Vault, an Atherio client. Cory was not required to pay any money back to Atherio. He was not required to turn himself into state or federal authorities. He was simply allowed to walk away from the chaos and disorder he helped create.

## K.     Prudent finds Atherio in default based on Cory's actions and the company's mismanagement

50.     In early 2014—months before Cory executed his cushy exit package with Atherio—Prudent declared Atherio to be in default of its loan obligations and foreclosed on Cory's Atherio stock.  Prudent took control of Atherio at the time of this stock transfer.

51.     This change-of-control event independently triggered Atherio's obligation to make the Earn-Out Payments to Plaintiffs. But Atherio did not pay to Plaintiffs any of the Earn-Out Payments due to them.

**L.      Plaintiffs' Earn-Out Payments are due and owing**

52.      By way of information and belief, Atherio reached the first EBITDA goal prior to the end of the First Earn-Out period on March 31, 2014. However, Atherio has not made the required Earn-Out Payments and has not provided the reports required by the Purchase Agreement.

53.      The Purchase Agreement expressly provides that Atherio "shall not undertake nor permit any officer, director, employee, representative, advisor, Affiliate or business unit [of Atherio] to undertake any subterfuge, scheme or device an objective or intent of which is to lessen, minimize, evade or avoid its obligations" under the earn-out commitments set forth therein.

54.      Although these Earn-Out Payments have become due and owing, Atherio has refused to make these payments and has refused to provide Plaintiffs with access to business records.

55.      Further, Prudent has insisted that it is entitled to subordinate such payments notwithstanding its actions. By way of information and belief, any condition of subordination that exists between Atherio and Prudent is a result of Atherio's failure to operate the business in a commercially reasonable manner.

**M.      Key Executive Employment Agreement and NVISH**

56.      In conjunction with the Purchase Agreement, Plaintiffs each entered into a "Key Executive Employment Agreement" (the "Employment Agreements") with Atherio. These Employment Agreements also included incentive bonuses based on Atherio achieving certain EBITDA, revenue, and sales goals. By way of information and belief, Atherio has met certain targets and thus, Plaintiffs are entitled to bonus payments. However, Atherio has not paid Plaintiffs the bonuses they earned. Moreover, Atherio has continued to deny Plaintiffs access to the books and records they are contractually entitled to see.

57.     To induce Plaintiffs to sell their business to Atherio and accept Atherio's equity as partial payment therefor, Atherio made numerous representations and warranties to them in the Purchase Agreement, including representations and warranties related to NVISH, another company that was acquired at or about the same time as part of Atherio's "roll-up" strategy.

58.     By way of information and belief, these representations and warranties have been breached.

59.     In all, Defendants owe Plaintiffs at least $20.5 million.

| Consideration | Amount | Addressed in Complaint |
|---|---|---|
| Earn-Out Payments | $1.5 million | *See* ¶¶ 12, 21 |
| Atherio Equity | $19 million | *See* ¶¶ 12, 21 |
| Add'l bonuses from employment agreements | TBD | *See* ¶ 49 |

**Total: At least $20.5 million**

This amount includes the amounts owed for Plaintiffs' Earn-Out Payments and the represented 2016 value of the Atherio equity given to Plaintiffs. Plaintiffs now sue for the aforementioned amounts that are due and owing.

**VI.**
**CAUSES OF ACTION**

**A.     Violation of Federal Securities Laws – Rule 10b-5 Claim**

60.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

61.     Pursuant to 15 U.S.C. § 78j and 17 C.F.R. § 240.10b-5, the resignation of Farb, Atherio's Executive Vice President and Chief Financial Officer, was a material fact that Defendants intentionally hid, omitted, and did not disclose to Plaintiffs. Additionally, Defendants did not disclose to Plaintiffs that some or all of Cory's professional background is false. These

material omissions, individually and collectively, were made with an intent to deceive, manipulate, or defraud. Had Plaintiffs known of these material facts, they would not have commenced with the closing of the sale of their company, Red River, to Atherio.  There exists a connection between the material omissions and the purchase of a security (Red River). Plaintiffs relied on the material omissions in that the information Defendants provided to Plaintiffs (which turned out to be not the entire truth) caused Plaintiffs to commence with the closing of the acquisition. Plaintiffs suffered economic loss as a result of their reliance. There exists a causal connection between the omissions and the economic injury.

62.    Additionally, as enumerated above, to induce Plaintiffs to sell Red River, Defendants made numerous material misrepresentations about its future, its capabilities, and its management.  These material misrepresentations were made with an intent to deceive, manipulate, or defraud. There exists a connection between the material misrepresentations and the purchase of a security (Red River). Plaintiffs relied on these material misrepresentations and suffered economic loss as a result of their reliance. There exists a causal connection between the misrepresentations and the economic injury.

63.    As set forth more fully below and as a result of Defendants' intentional conduct, Plaintiffs sustained damages which include but are not limited to out-of-pocket damages, benefit-of-the-bargain damages, rescission, restitution, consequential damages, exemplary damages, attorney's fees, court costs, and pre- and post-judgment interest.

**B.    Violation of Securities Law – 581-33 of the Texas Securities Act**

64.    The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

65.    Pursuant to Article 581-33 of the Texas Revised Civil Statutes, the resignation of

Farb, Atherio's Executive Vice President and Chief Financial Officer, was a material fact that Defendants intentionally hid, omitted, and did not disclose to Plaintiffs. Additionally, Defendants did not disclose to Plaintiffs that some or all of Cory's professional background is false. These material omissions, individually and collectively, were made with an intent to deceive, manipulate, or defraud. Had Plaintiffs known of these material facts, they would not have commenced with the closing of the sale of their company, Red River, to Atherio.  There exists a connection between the material omissions and the purchase of a security (Red River). Plaintiffs relied on the material omissions in that the information Defendants provided to Plaintiffs (which turned out to be not the entire truth) caused Plaintiffs to commence with the closing of the acquisition. Plaintiffs suffered economic loss as a result of their reliance. There exists a causal connection between the omissions and the economic injury.

66.     Additionally, as enumerated above, to induce Plaintiffs to sell Red River, Defendants made numerous material misrepresentations about its future, its capabilities, and its management.  These material misrepresentations are untrue statements, made with an intent to deceive, manipulate, or defraud. There exists a connection between the material misrepresentations and the purchase of a security (Red River). Plaintiffs relied on these material misrepresentations and suffered economic loss as a result of their reliance. There exists a causal connection between the misrepresentations and the economic injury.

67.     As set forth more fully below and as a result of Defendants' intentional conduct, Plaintiffs sustained damages which include but are not limited to out-of-pocket damages, benefit-of-the-bargain damages, rescission, restitution, consequential damages, attorney's fees, court costs, and pre- and post-judgment interest.

## C.     Breach of Fiduciary Duty

68.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

69.     Defendants owed Plaintiffs a duty not to speak falsely and Cory and Furst, as directors of Atherio and acting on behalf of the company, owed Plaintiffs, who are Atherio stockholders, several fiduciary duties including the duties of care, loyalty, good faith, and disclosure. Defendants breached their respective fiduciary duties in the following ways: they failed to disclose to Plaintiffs the Farb resignation; they failed to disclose to Plaintiffs Cory's removal from Atherio; as described more fully above, Cory engaged in numerous wrongful and criminal acts; they failed to disclose to Plaintiffs Cory's numerous wrongful and criminal acts; they failed to stay reasonably informed of material information such as the cause of accounting irregularities, unexplained losses, and incorrect borrowing base certificates; failing to failing to operate the business as commercially reasonable to maximize EBITDA and the opportunity for the Earn-Out Payments to Plaintiffs; and Furst, as the Chief Executive Officer of Atherio, permitted Cory to take, in his exit package, additional money and client accounts receivable from the company instead of forcing Cory to make restitution to the company.

70.     These numerous breaches injured Plaintiffs and/or benefited Defendants.

71.     As set forth more fully below and as a result of Defendants' intentional conduct, Plaintiffs sustained damages which include but are not limited to actual damages and exemplary damages, the imposition of a constructive trust, profit disgorgement, accounting, the imposition of a receivership, rescission, court costs, and pre- and post-judgment interest.

## D.     Breach of Contract

72.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

73.     Plaintiffs have performed all of their obligations under the Purchase Agreement, the Employment Agreements, and the Repricing Letters (collectively the "Agreements").

74.     Defendants have breached the Agreements by failing to pay Plaintiffs all of the consideration required by the Agreements and causing those payments not to be made, by refusing Plaintiffs access to the books and records of Atherio and Red River, and by making false representations and warranties.

75.     As set forth more fully below and as a result of Defendants' breaches, Plaintiffs have suffered economic damages which include but are not limited to actual damages, attorney's fees, court costs, and pre- and post-judgment interest.

**E.      Statutory Fraud**

76.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

77.     The purchase of Red River by Atherio is a transaction involving stock. During the transaction, Defendants made numerous false representations.  These false promises were made for the purpose of inducing Plaintiffs to enter into the Purchase Agreement, among other contracts, for the sale of Red River to Atherio. Plaintiffs relied on these false representations by entering into the Purchase Agreement.

78.     As set forth more fully below and as a result of Defendants' intentional conduct, Plaintiffs sustained damages which include but are not limited to out-of-pocket damages, benefit-of-the-bargain damages, rescission, restitution, specific performance, attorney's fees, expert witness fees, costs for copies of depositions, court costs, and pre- and post-judgment interest.

**F.      Common Law Fraud**

79.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth

herein.

80.     Defendants made numerous material, false representations to Plaintiffs.   When Defendants made these representations, Defendants either knew the representations were false or made the representations recklessly, as a positive assertion, and without knowledge of the statements' truth. Defendants made the representations with the intent that Plaintiffs act on them. Plaintiffs relied on these representations.

81.     As set forth more fully below and as a result of Defendants' intentional conduct, Plaintiffs sustained damages which include but are not limited to out-of-pocket damages, benefit-of-the-bargain damages, rescission, exemplary damages, attorney's fees, court costs, and pre- and post-judgment interest.

**G.     Fraud by Nondisclosure**

82.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

83.     Defendants concealed from or failed to disclose certain facts to Plaintiffs such as the resignation of Tom Farb just prior to the closing of Atherio's acquisition of Red River and that, further, some or all of Cory's professional background is false. Defendants had a duty to disclose these facts to Plaintiffs. These facts were material. Defendants knew Plaintiffs were ignorant of the facts and that Plaintiffs did not have an equal opportunity to discover the facts. Defendants were deliberately silent when they had a duty to speak. By failing to disclose these facts, Defendants intended to induce Plaintiffs to take some action—agree to the sale of their company to Atherio. Plaintiffs relied on this nondisclosure and were injured as a result of acting without knowledge of the undisclosed facts.

84.     As set forth more fully below and as a result of Defendants' breaches, Plaintiffs

have suffered damages which include but are not limited to out-of-pocket damages, benefit-of-the-bargain damages, rescission, exemplary damages, court costs, and pre- and post-judgment interest.

## VII.
### PROXIMATE CAUSE

85.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

86.     Each and every, all and singular of the foregoing acts and omissions, on the part of Defendants, taken separately and/or collectively, jointly, and severally, constitute a direct and proximate cause of the damages set forth herein.

## VIII.
### DAMAGES

87.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

88.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered injuries and damages, for which they are entitled to recover herein, within the jurisdictional limits of this court, including but not limited to out-of-pocket damages, benefit-of-the-bargain damages, actual damages for pecuniary loss, rescission, restitution, specific performance, exemplary damages, accounting, attorney's fees, expert witness fees, costs for copies of depositions, court costs, pre- and post-judgment interest, and such other relief to which Plaintiffs may be entitled.

## IX.
## CONDITION PRECEDENT

89.     All conditions precedent to the maintenance of the causes of action and Plaintiffs'

recovery thereon, including attorneys' fees, have occurred or been performed.

### PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs prays for judgment against

Defendants and requests an order including but not limited to the following relief:

(a)     Actual damages against Defendants in an amount to be proven at trial;

(b)     Reasonable and necessary attorneys' fees and court costs in the trial court and all
        subsequent appeals;

(c)     Prejudgment and post-judgment interest at the highest lawful rates; and

(d)     All such other relief to which Plaintiffs may show itself to be justly entitled.

Respectfully submitted,

**RYAN LAW PARTNERS LLP**

By:  /s/ Andrew B. Ryan
        Andrew B. Ryan
          State Bar No. 24054464
          andy@ryanlawpartners.com
        Daniel W. Meyler
          State Bar No. 24090263
          dan@ryanlawpartners.com

100 Highland Park Village, Suite 200
Dallas, Texas 75205
(214) 417-0076 – phone
(888) 594-6240 – fax

**ATTORNEYS FOR PLAINTIFFS**