# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| TAMMY O'CONNOR and MICHAEL STEWART, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. 3:16-CV-1731-B |
| JASON CORY, THOMAS FARB, and GREG FURST, | § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs sold their company to the Defendants' company. A purchasing agreement memorialized the transaction. Plaintiffs bring claims for securities fraud and common-law fraud against Defendants based on alleged misrepresentations in this Agreement. Defendants now move for summary judgment on a number of grounds. The Court **GRANTS** Defendants' motions because (1) Plaintiffs have failed to establish their alleged loss was caused by Defendants' conduct and (2) Plaintiffs failed to plead an equitable-fraud claim. Plaintiffs' claims are therefore **DISMISSED**.

## I.

## BACKGROUND

A.      *Factual History*[1]

This dispute stems from a written purchase agreement (hereinafter the "Agreement")

---

[1] This factual history is drawn from the summary-judgment evidence, provided in the pending summary-judgment briefing and the briefing from the Rule 56(f) Order. Factual disputes are noted.

between Plaintiffs Tammy O'Connor and Michael Stewart, and Atherio, Inc.[2] (Atherio). Under this Agreement, Plaintiffs sold their interest in their technology-consulting company, Red River Solutions, to Atherio. *See* Doc. 118-2, Pls.' App., 7–70 (the Agreement).

In the summer of 2012, Plaintiffs began marketing their company for sale through an investment banker and a transactional lawyer. Doc. 124, Defs.' Resp., 5. Shortly thereafter, Plaintiffs began negotiating the sale of the company with representatives from Atherio. Over the course of eleven months, the two sides negotiated and finalized the Agreement whereby Atherio would purchase Plaintiffs' interest in Red River Solutions in exchange for $3.15 million, stock in Atherio, and other compensation. *See* Doc. 95, Def. Cory's Resp. to Pls.' Mot. for Summ. J., 5. The deal closed sometime between June 25 and June 27 of 2013.[3]

Plaintiffs now allege fraud claims against Defendants Jason Cory, Thomas Farb, and Greg Furst in relation to this Agreement. During the negotiation and closing of the transaction, Defendant Cory was Atherio's Chief Executive Officer. Defendants Farb and Furst also held executive positions at Atherio.

Plaintiffs base their fraud claims on alleged misrepresentations in the Agreement regarding the resignation of Thomas Farb as Atherio's Chief Financial Officer. Doc. 156, Pls.' Resp. to Defs.' Mot. Summ. J., 26–39. Sometime in the summer or fall of 2012, Plaintiffs claim they were told that Farb would be Atherio's CFO. *See* Doc. 124-4, Defs.' App'x, 21 (Deposition of Tammy O'Connor). Farb signed an employment agreement with Atherio on or around December 28, 2012. Doc. 156,

---

[2] Plaintiffs dismissed Atherio, Inc. in their amended complaint. Doc. 37, 2d Am. Compl.

[3] While the Agreement is dated June 25, 2013, Doc. 118-2, Pls.' App'x, 7, Plaintiffs assert there is a fact issue as to when the transaction actually closed. *See* Doc. 129, Pls.' Reply, 4.

Pls.' Resp., 9; Doc. 156, Pls.' App'x, 122 (unsigned employment agreement). This employment agreement contains a number of provisions relevant to Plaintiffs' fraud claims. To start, the employment agreement specified Farb would be paid a base salary of at least $250,000 per annum, as well as a guaranteed annual bonus of not less than $200,000. Doc. 156, Pls.' App'x, 123. The employment agreement also provides that upon Farb's voluntary resignation from Atherio for "Good Reason," Farb would be entitled to a number of severance benefits, including a "lump sum payment equal to two times Executive's base salary . . . payable in full within thirty (30) days of such Involuntary Termination," and guaranteed bonus payments. *Id.* at 126–29; Doc. 156, Pls.' Resp., 9–10 (Plaintiffs calculate the total severance pay owed Farb at $1,020,500). However, Farb was entitled to these severance benefits only "[i]n the event of his Involuntary Termination." Doc. 156, Pls.' App'x, 128. Under the employment agreement, "Involuntary Termination" included a situation where Farb "voluntarily resigns from the Company for any of the following reasons ('Good Reason')[.]" *Id.* One of the reasons was:

> The deterioration of Executive's relationship with the Company's Board of Directors, Chairman, President and/or Chief Operating Officer . . . , which determination shall be made by Executive in his sole discretion, so as to make performance of Executive's responsibilities impossible or impracticable, which is not rectified to Executive's reasonable satisfaction within thirty (30) day's written notice thereof to the Company from Executive.

*Id.* (¶ VIII.A.2.d).

In the months leading up to the close of the Agreement, Farb's relationship with Cory and Atherio deteriorated. This seems to be due to the fact that Farb was not being paid. Doc. 156, Pls.' App'x, 715 (Deposition of Farb). On June 5, 2013, Farb sent written notice to Cory stating that he was invoking the "Involuntary Termination" Section (VIII.A.2.d) in his employment agreement.

Doc. 140, Farb & Furst's App'x, 499–503. Plaintiffs assert that this written notice triggered the "Good Reasons" portion of the employment agreement that entitled Farb to over $1 million in severance benefits. Doc. 156, Pls.' Resp., 14–15. Defendants argue this merely triggered a reconciliation period whereby Farb and Atherio had thirty days (until July 5, 2013) to cure the employment relationship. Doc. 140, Farb & Furst's Mot. Summ. J., 8. After Farb sent this notice, he and Cory continued to negotiate regarding his employment status and compensation structure going forward. Doc. 156, Pls.' Resp., 15 (citing Pls.' App'x, 286, 289, 295, 298). Also during this time, Defendants were sending Plaintiffs disclosures listing the employment status of Atherio's executives, including Farb. Doc. 156, Pls.' App'x, 387.

The Agreement has an effective date of June 25, 2013, but the transaction was not fully funded until June 27, 2013. Doc. 140, Farb & Furst's Mot. Summ. J., 8 (citing Farb & Furst's App'x, 2). The delay appears to be caused by the status of Farb's employment and Atherio's lenders. Atherio needed two lenders to complete the transaction: SunTrust (the senior lender) and Prudent Capital (the mezzanine lender). Doc. 140, Farb & Furst App'x, 531. However, before the lenders would agree to finance the transaction, the executives at Atherio, including Farb, had to revise their employment agreements and waive rights under their old agreements. *Id.* Leading up to the close, Farb and Cory were vigorously disputing what a new agreement for Farb would look like, how much equity he would get under such an agreement, and what Farb's new title at Atherio would be. Doc. 156, Pls.' Resp., 19–23 (collecting correspondence between Farb and Cory). But it appeared that both realized Farb needed to be at Atherio for the Agreement to close. Doc. 156, Pls.' App'x, 391–92.

On June 26, 2013, a day after the Agreement was signed, Farb signed a new employment

agreement. Doc. 140, Farb & Furst's App'x, 504–509. In that agreement, Farb waived any rights under his original employment agreement with Atherio, including any deferred compensation or severance. *Id.* Farb would continue working at Atherio through September 2013, but he would no longer be the CFO. *Id.* (noting his title changed to "Executive Vice President, Corporate Development").

On June 27, 2013, Farb entered into another agreement, this time with Atherio Investments, LLC and Atherio Investments Management, LLC. *Id.* at 510–19. Under this second agreement, to which Atherio, Inc. was not a party, the parties agreed to use "reasonable efforts" to effectuate an assumption agreement with Atherio, Inc. whereby the two Atherio LLCs would assume a portion of Farb's deferred compensation previously owed under his original employment agreement. *Id.* Plaintiffs argue that none of this information was disclosed to them before or during the close of the transaction. Doc. 156, Pls.' Resp., 22. Further, Plaintiffs claim that these releases were part of a scheme to temporarily remove the $1 million liability of severance benefits Atherio owed Farb. *Id.* Plaintiffs argue that Defendants formed, controlled, and operated these Atherio LLCs as vehicles to conceal Atherio's liability to Farb in order to ensure Plaintiffs would go through with the sale of their company. *Id.* Defendants argue that (1) Farb released any right to severance before these agreements were made so no severance obligation was ever owed and (2) the assumption agreement was never entered into and thus was never a liability for Atherio. Doc. 140, Farb & Furst's Mot. Summ. J., 11; Doc. 144, Cory's Br. Summ. J., 8.

In sum, Plaintiffs' fraud claims are based on (1) Defendants' failure to disclose that Farb may not have been Atherio's CFO at the close of the Agreement and (2) Defendants' failure to disclose an alleged severance obligation owed to Farb and the assumption agreements related to the

obligation.

B.     *Procedural History*

Plaintiffs filed their Complaint against Defendants on June 23, 2016. *See* Doc. 1, Pls.' Compl. Plaintiffs' current Second Amended Complaint alleges causes of action under federal securities laws, Texas securities law, and common law fraud and unspecified statutory law fraud. *See* Doc. 37, Pls.' 2d Am. Compl.

This Order succeeds the Court's previous Rule 56(f) Order (Doc. 152). As will be explained below, the Court ruled in that Order that Plaintiffs' claims are limited, based on a nonreliance clause, to representations made in the Agreement. In that Order, the Court also dismissed Plaintiffs' Texas securities act claim based on the choice-of-law clause in the Agreement.

Defendants Farb and Furst filed their motion for summary judgment on September 27, 2018 (Doc. 140). Defendant Cory filed his amended motion for summary judgment on September 28, 2018 (Doc. 142). Plaintiffs filed their response on November 5, 2018 (Doc. 156). Cory filed his reply on November 19, 2018 (Doc. 165). Farb and Furst filed their reply on that same day (Doc. 167). With the motions now ripe for review, the Court will consider whether summary judgment is appropriate.

## II.

## LEGAL STANDARD

Courts must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. SmithKline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the

nonmovant ultimately bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Rather, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the nonmovant's case. *Id.* When the movant bears the burden of proving an affirmative defense at trial, "it must establish beyond dispute all of the defense's essential elements." *Bank of La. v. Aetna U.S. Healthcare, Inc.*, 468 F.3d 237, 241 (5th Cir. 2006) (citing *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

Once the summary judgment movant has met this burden, the nonmovant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam). Factual controversies regarding the existence of a genuine issue for trial must be resolved in favor of the nonmovant. *Id.* Nevertheless, a nonmovant may not simply rely on the Court to sift through the record to find a fact issue, but must instead point to specific evidence in the record and articulate precisely how that evidence supports the challenged claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Moreover, the evidence the nonmovant does provide must raise more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the nonmovant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1075.

## III.

## ANALYSIS

Defendant Jason Cory and Defendants Thomas Farb and Greg Furst have separately moved for summary judgment on all of Plaintiffs' claims. Doc. 142, Cory's Mot. for Summ. J.; Doc. 140, Farb

& Furst's Mot. for Summ. J. Some of their arguments overlap; some do not. The Court will address their arguments together, where possible, and separately where it cannot. Additionally, some of their grounds for summary judgment have been addressed in the Court's previous orders. *See, e.g.*, Doc. 152, Rule 56(f) Order, & Doc. 157, Mem. Op. & Order on Mot. for Leave to Am. The Court will not reconsider those rulings.

Plaintiffs have two claims remaining against Defendants: (1) a federal securities-fraud claim under § 10(b) of the Exchange Act and (2) a common-law fraud claim under Delaware law. These claims are based on misrepresentations or omissions Defendants made in connection with Atherio's Agreement to purchase Plaintiffs' company, Red River Solutions. Importantly, as the Court held in the Rule 56(f) Order, the nonreliance clause in the Agreement limits both of Plaintiffs' fraud claims to representations specifically made in that Agreement. Doc. 152, Rule 56(f) Order. Thus, Plaintiffs' claims have been restricted to three misrepresentations in the Agreement, all related to Farb's resignation as CFO of Atherio and alleged severance obligations owed to Farb after his resignation.

Defendants all move for summary judgment on the ground that Plaintiffs cannot support certain elements of their fraud claims. Specifically, Cory argues that there were no misrepresentations in the Agreement and that, even if there were, they would not be material. Cory also argues he did not have a duty to disclose information related to Farb's employment situation. Next, all Defendants argue that Plaintiffs have not adduced evidence of loss causation—*i.e.*, that the alleged fraud here legally caused Plaintiffs' economic loss. Cory further argues there is no evidence that Plaintiffs justifiably relied on the alleged representations. And Farb and Furst argue that Plaintiffs cannot demonstrate sufficient evidence to create a fact issue on damages.

Additionally, Defendants argue other defenses entitle them to summary judgment. Cory

argues Plaintiffs' claims should be dismissed because (1) Plaintiffs released their claims against Cory in a separate agreement, (2) Plaintiffs' claims are barred by the statute of limitations, and (3) Plaintiffs failed to adequately plead alleged misrepresentations based on certain provisions in the Agreement and failed to plead an equitable-fraud claim. Further, Farb and Furst argue Plaintiffs' claims sound in contract, not tort.

The Court will first address Defendants' arguments that Plaintiffs failed to adequately plead certain facts and claims. The Court will then turn to Defendants' challenges to Plaintiffs' proof of the elements of their claims. Finally, the Court will analyze Defendants' defenses.

A.    *Adequacy of Pleadings*

i.    *Pleadings Based on Misrepresentations of the Agreement*

Cory argues that, in response to the Court's Rule 56(f) Order, Plaintiffs altered their pleadings and argued for the first time that Defendants violated representations made in §§ 4.3 and 4.6 of the Agreement. Doc. 144, Cory' Br. Summ. J., 47–49. Plaintiffs counter that their allegations related to these sections of the Agreement and Farb's severance obligation are sufficiently detailed in their second amended complaint. Doc. 156, Pls.' Resp., 51. On reply, Cory presses that § 4.3 of the Agreement is never mentioned in the complaint. Doc. 165, Cory's Reply, 29.

"To state a claim under Rule 10b-5 'a plaintiff must allege, in connection with the purchase or sale of securities, (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused [the plaintiff's] injury.'" *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017) (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406–07 (5th Cir. 2001)) (internal quotations omitted). Specifically, to avoid dismissal, the plaintiff must:

(1) specify . . . each statement alleged to have been misleading, i.e., contended to be

fraudulent; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Id.* (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 244 (5th Cir. 2003)). In other words, under Rule 9(b), Plaintiffs must plead "who, what, when, where, and how." *Goldstein*, 340 F.3d at 245.

Starting with § 4.6, the Court finds Plaintiffs adequately pleaded a securities-fraud claim as to a violation of this section. In paragraphs 252 to 264 of the second amended complaint, Plaintiffs thoroughly discuss the specific representations in §§ 4.6(a) & (b) of the Agreement that they believe Defendants violated. Doc. 37, 2d Am. Compl., ¶¶ 252–264. Plaintiffs specify that from this misrepresentation, the Defendants were able to hide a large liability and avoid insolvency, *id.* ¶¶ 260–61, and induce Plaintiffs to enter into the transaction. *Id.* ¶ 265. Plaintiffs also sufficiently pleaded how the statement was misleading: the undisclosed severance-obligation agreements violated GAAP (as required by § 4.6(a)) and was an undisclosed liability (violating § 4.6(b)). *See id.* ¶¶ 253–60; ¶¶ 154–64 (discussing the alleged violation of GAAP based on the undisclosed severance obligation). Thus, the Court will not grant Cory's motion as to allegations related to § 4.6.

The Court will not do the same for the § 4.3 claims. As admitted by Plaintiffs and stressed by Cory, the second amended complaint nowhere mentions § 4.3. *See* Doc. 37, 2d Am. Compl.; Doc. 156, Pls.' Resp., 51 n.28. Plaintiffs argue their allegations should survive because they sufficiently described the acts that violated this section elsewhere in the complaint. *Id.* The Court rejects this contention—the law is clear that Plaintiffs must identify "each statement alleged to have been misleading." *Goldstein*, 340 F.3d at 244. Because Plaintiffs have done so only in summary-judgment briefing and have not requested leave to replead, the Court finds they have not sufficiently pleaded

a claim with respect to violations of § 4.3. The Court thus alternatively grants Cory's motion with respect to this argument.

ii.    *Pleading Equitable Fraud Under Delaware Law*

Cory also argues that Plaintiffs failed to plead an equitable-fraud claim under Delaware law. Doc. 144, Cory's Br. Summ. J., 47–48. Cory claims that Plaintiffs asserted this claim for the first time in their Rule 56(f) briefing. *Id.* (citing Doc. 118, Pls.' Rule 56(f) Resp., 7–8). When Plaintiffs made that assertion in response briefing, they acknowledged that "Defendants may argue that Plaintiffs have not pleaded" this cause of action. Doc. 118, Pls.' Rule 56(f) Resp., 7 n.6. Plaintiffs now argue that they have adequately pleaded such a claim because they sued Defendants "for state-law fraud" under Delaware law and that state law includes causes of action for both common-law and equitable fraud. Doc. 156, Pls.' Resp., 44–45. Plaintiffs further assert that because the elements of both claims are essentially the same, "a plaintiff who successfully pleads common law fraud has also successfully pleaded equitable fraud." *Id.* at 45 n.29. Cory argues equitable fraud is sufficiently different because it requires a source of equity jurisdiction, such as a right founded upon a special relationship, and Plaintiffs have failed to plead any such source. Doc. 165, Cory's Reply, 24–25.

Plaintiffs are correct to point out that the "elements of equitable fraud are similar to the elements of common law fraud, except that proof of scienter . . . is not necessary to obtain relief." *Marina View Condo. Ass'n of Unit Owners v. Rehoboth Marina Ventures, LLC,* 2018 WL 1172581, at *7 (Del. Ch. Mar. 6, 2018). But Cory is correct in arguing "the party claiming equitable fraud needs to show either a special relationship between the parties such as a fiduciary relationship, or other justification for an equitable remedy." *Id.* Delaware courts have dismissed equitable-fraud claims on the pleadings where plaintiffs fail to show that a special relationship or other circumstances justified

equity jurisdiction. *Osram Sylvania Inc. v. Townsend Ventures, LLC,* 2013 WL 6199554, at *15 (Del. Ch. Nov. 19, 2013) (granting motion to dismiss equitable-fraud claim where (1) parties negotiated contract at arm's length, (2) no special relationship existed, and (3) parties were sophisticated and had access to counsel during the transaction). Like the parties in *Osram Sylvania,* the parties here were sophisticated and represented by independent counsel. Doc. 145-1, Cory's App'x, 29–30, 45 (citing multiple sections of the Agreement where parties warrant they themselves or with assistance have sufficient financial sophistication to appraise the risks of the transaction); *Id.* at 62 (parties agreeing they were advised by counsel with respect to the transaction). Further, no party has alleged or produced evidence that shows there was a special or fiduciary relationship here.

Because Plaintiffs have failed to adequately plead such a claim, the Court dismisses Plaintiffs' equitable-fraud claim. The Court next moves to Defendants' arguments that Plaintiffs have not adduced sufficient evidence to prove certain elements of their claims.

B.     *Securities-Fraud Claim Under § 10(b) and 10b-5*

Plaintiffs plead a claim under section 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5. The Exchange Act prohibits "(1) the 'use or employment' . . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of Securities and Exchange Commission 'rules and regulations.'" *Lormand v. US Unwired, Inc.,* 565 F.3d 228, 238 (5th Cir. 2009) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5 prohibits "the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b-5).

"The courts have implied from these statutes and Rule a private damages action, which

resembles, but is not identical to, common-law tort actions for deceit and misrepresentation." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). To sustain this private action, a plaintiff must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008). Defendants challenge Plaintiffs' evidence to the following elements of their claim.

i.    *Misrepresentations or Omissions*

The first element a private securities-fraud plaintiff must show is a material misrepresentation or omission. *See Lormand*, 565 F.3d at 238 . Cory asserts that Plaintiffs' 10b-5 claim is defective because Plaintiffs have no evidence any misrepresentations or omissions were made with respect to Farb's resignation. Doc. 144, Cory's Br. Summ. J., 19–21.[4] Plaintiffs, in turn, argue that statements and omissions related to Farb's resignation did in fact constitute misrepresentations of different provisions of the Agreement. Doc. 156, Pls.' Resp., 26–39.

Plaintiffs argue three misrepresentations in the Agreement form the basis of their fraud claims:

(1) Defendants violated § 4.6 by failing to disclose severance liabilities owed to Farb;

(2) Defendants violated § 4.3 by failing to disclose an outstanding agreement obligating Atherio to issue stock to another party; and

(3) Defendants misrepresented Farb's status as CFO in a capitalization table listing

---

[4] In the alternative, Cory alleges that even if certain statements were misrepresentations, they were not material. The Court finds that Cory's materiality complaints have been mooted by the Rule 56(f) Order because the challenged statements were extracontractual.

the issued and outstanding equity of Atherio.

The Court analyzes each representation separately.

    a.    <u>Section 4.6</u>

In § 4.6(a) of the Agreement, Atherio represented and warranted that each of its financial statements disclosed in the transaction had "been prepared in accordance with GAAP [Generally Accepted Accounting Principles]"[5] and "fairly present, in accordance with GAAP, the financial position, results of operations and cash flows of its business of the entities . . . ." Doc. 145–1, Cory's App'x, 49. In § 4.6(b), Atherio warranted that it "does not have any Liability except" for liabilities disclosed in its financial statements and disclosure schedules. *Id.* Plaintiffs argue that the alleged severance obligation owed to Farb should have been disclosed or accrued on these financial statements because GAAP requires it. Doc. 156, Pls.' Resp., 26. Cory responds that there is no evidence a severance obligation was ever owed to Farb and thus there was nothing to disclose that would violate this section. Doc. 165, Cory's Reply, 9–11.

Cory bases this argument on two factual propositions. First, Cory asserts the severance obligation was never an obligation because Farb never resigned. Doc. 144, Cory's Br. Summ. J., 21. Farb sent Cory an official resignation letter on June 5, 2013—20 days before the alleged June 25, 2013 closing date.[6] The resignation letter, according to Cory, triggered a thirty-day period in Farb's

---

[5] Generally Accepted Accounting Principles ("GAAP") are adopted by the Federal Accounting Standards Board ("FASB"). As courts have noted, "[t]he term generally accepted accounting principles . . . is a term of art encompassing a wide range of acceptable procedures, such that an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1021 (5th Cir. 1996) (quoting *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 315 (5th Cir. 1988)).

[6] As discussed, the closing date is disputed.

employment agreement under which Atherio and Farb could rectify the situation to Farb's "reasonable satisfaction." Doc. 145, Cory's App'x, 112 (Farb's Employment Agreement). After this thirty-day period, if Farb was not satisfied, his resignation would become effective. *Id.* Thus, Cory argues, Farb's resignation would not become effective until July 5, 2013, and that is only if the situation could not be rectified. Doc. 144, Cory's Br. Summ. J., 21. And, to add, Farb's employment agreement did not require the severance obligation to become payable until thirty days after the effective resignation date. *Id.* Thus, Cory presses, any obligation owed to Farb would not have to have been paid until August 4, 2013, at the earliest, and therefore there was no alleged severance obligation to disclose leading up to the close. *Id.* at 21–22.

Second, Cory argues the Agreement could not close unless Farb first released or amended his employment agreement. Doc. 165, Cory's Reply, 10. Cory cites to email chains between him and Farb discussing the need to revise Farb's employment agreement in order to obtain necessary funds from investment firms to close the transaction. *Id.* One of Atherio's main lenders, Prudent Capital, required that the executive employment agreements (including Farb's) be revised, presumably to remove large potential liabilities presented by those agreements. *Id.* Plaintiffs agree with this point. Doc. 156, Pls.' Resp., 19. Cory thus argues that the close of the transaction is proof that the severance obligation was never paid because the transaction could never have closed with such an obligation on Atherio's books. Doc. 165, Cory's Reply, 11.

In response, Plaintiffs point to evidence they argue indicates that the severance obligation should have made it into the financial disclosures.[7] Plaintiffs first provide expert testimony on GAAP

---

[7] Plaintiffs, for the first time in response briefing, argue that Defendants' alleged failure to disclose a $250,000 note also violated § 4.6(b) of the Agreement because it was an undisclosed liability. But the

requirements. Doc. 156, Pls.' Resp., 38. Plaintiffs' expert, Byers,[8] testified that once Cory received the initial resignation letter on May 31, 2013, Atherio was required to determine whether to accrue or disclose this potential liability. *Id.* Byers has opined that "Atherio violated accounting principles generally accepted in the United States of America, U.S. GAAP, by not recording at least $405,300 no later than May 31, 2013, for a severance accrual and not disclosing the risk of potential loss of at least $1,055,542." Doc. 155, Defs.' Mot. to Exclude, 1–2. Byers further testified that Atherio's financial statements needed to be GAAP-compliant the date they were provided to Plaintiffs and that they were not compliant. Doc. 156, Pls.' Resp., 31.

Plaintiffs also push back on Cory's assertion that there was no misrepresentation because Farb was never owed a severance obligation.[9] Doc. 156, Pls.' Resp., 39. Plaintiffs cite to the side agreements between Atherio, Farb, and Atherio-related entities that were made on or immediately before the closing of the Purchase Agreement. *Id.* According to Plaintiffs, these side agreements shifted the severance liability owed to Farb to these other entities. *Id.* Plaintiffs were never told about

---

second amended complaint nowhere alleges that Atherio breached this section by failing to disclose this note. Doc. 37, 2d Am. Compl.; Doc. 167, Farb & Furst's Reply, 16–17. The Court therefore disregards any arguments related to the note. *See Pierce v. Hearne Indep. Sch. Dist.*, 600 F. App'x, 194, 200 (5th Cir. 2015) (noting that new factual allegations raised in response to dispositive motions need not be construed as a request for leave to amend) (citing *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 387 (5th Cir. 2003)).

[8] Cory has moved to exclude the testimony of Byers, Doc. 155, and objects to the consideration of her testimony at summary judgment under Rule 56(c)(2). Doc. 166. Cory makes a number of objections to her testimony, including that it is irrelevant, misleading, unreliable, conclusory, and based on improper legal conclusions. Doc. 155, Cory's Mot. to Exclude, 2. The Court **DENIES** this motion as it finds that Cory's issues with Byers' testimony could be sufficiently cured at trial with cross examination and rebuttal testimony on the requirements of GAAP.

[9] Plaintiffs make this argument in response to Cory's claim that Farb never resigned. The Court finds it factually applicable to Cory's argument that § 4.6 is not a misrepresentation and will thus consider the argument here, as well.

these agreements (a fact that Defendants do not appear to dispute). *Id.* From this, Plaintiffs press that Farb was, in fact, owed some form of severance, and that Atherio and Defendants were attempting to cover up this liability to appease Plaintiffs and their investors, thus allowing the transaction to go forward.

Finally, in their surreply,[10] Plaintiffs cite to testimony from Defendants' accounting expert, Carradine. Doc. 174-1, Pls.' Surreply, 4. Plaintiffs argue Carradine's testimony shows that (1) GAAP presumes financial statements are prepared on an accrual basis (i.e., recognizing liabilities when they are *incurred*, not just when they are *paid*) and (2) if there was a severance obligation, it should have been recorded as a current liability and disclosed to Plaintiffs. *Id.* at 4–5. And because Defendants did not do so, their financial disclosures were not in compliance of GAAP and thus § 4.6 was a misrepresentation.

After considering the arguments above, the Court finds that Plaintiffs have cited sufficient evidence to create a triable issue as to whether this section of the Agreement is a misrepresentation. Plaintiffs have introduced evidence that, without informing Plaintiffs, Farb sought to leave the company and invoke the severance portion of his employment agreement. Doc. 156, Pls.' Resp., 14–15. This severance obligation was substantial—totaling over $1 million. *Id.* And, while Cory may be right that Farb was never owed any severance (or that he wasn't owed this amount until after the close), the issue of whether Atherio's financial statements needed to disclose this pending liability is better left to accounting experts and the appraisal of trial testimony. The Court thus will not grant

---

[10] In the alternative to having the appendix of Cory's summary-judgment reply brief struck, Plaintiffs requested leave to file a surreply (Doc. 174). The Court grants Plaintiffs leave and will consider their arguments.

summary judgment on this issue.

> **b.**      Section 4.3(a)

Atherio represented in § 4.3(a) of the Agreement that, among other things, it had no outstanding stock rights or "agreements of any character" obligating Atherio to issue stock. However, as discussed in Part III.A.i., *supra*, the Court finds Plaintiffs failed to plead a fraud claim with respect to this section. The Court will not reach the parties' other arguments related to this section.

> **c.**      Capitalization Table

Plaintiffs last allege that Defendants misrepresented Farb's employment status as Atherio's CFO in a capitalization table provided in disclosures before the transaction closed. Doc. 156, Pls.' Resp., 42–43. With its disclosures for the Purchase Agreement, Defendants provided capitalization tables representing the outstanding and issued equity interests of Atherio to Plaintiffs. *Id.* In one of the tables, entitled "Ownership by Management Post Mezzanine Financing," the executives of Atherio are listed with their corresponding titles and equity interests; Farb is listed as Chief Financial Officer. *Id.* (citing Doc. 156-4, Pls.' App'x, 496). Plaintiffs argue this was a misrepresentation because Farb was no longer Atherio's CFO on June 26, 2013, one day before the transaction's mezzanine financing came in, and Plaintiffs were never told this fact. *Id.*

Cory argues a different side to the story. He asserts that, despite sending his resignation letter on June 6, 2013, Farb never considered changing his CFO title until June 26, 2013. Doc. 165, Cory's Reply, 20. Cory stresses that even though the transaction was not funded until June 27, 2013, the effective closing date was June 25, 2013 (the date listed on the Agreement). *Id.* (citing Doc. 145, Cory's App'x, 9, and expert testimony). Thus, Cory concludes that Farb was CFO through the close of the Agreement and the capitalization table was not a misrepresentation. *Id.* Further, Cory asserts

that Farb continued to act as CFO of Atherio until September 2013 when a new controller was hired. *Id.*

The Court will not grant summary judgment on this ground. Whether, as Cory claims, Farb was the CFO at the close and was expected to continue as CFO after the close is an issue replete with factual disputes. The Court believes Plaintiffs have brought forth sufficient evidence on this issue.

### ii.    Reliance

Cory argues that Plaintiffs have not shown evidence of justifiable reliance. Doc. 144, Cory's Br. Summ. J., 37. Plaintiffs do not respond to this argument. Doc. 156, Pls.' Resp. Under Rule 56(e), when a party fails to properly address another party's assertion of fact as required by Rule 56(c), the Court may: (1) give an opportunity to respond; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

Because the Court is granting summary judgment on other grounds, the Court will not reach Cory's reliance argument.

### iii.    Loss Causation

Defendants assert that Plaintiffs have failed to prove loss causation. Because the parties dispute the proper loss-causation standard to apply here, the Court will briefly review the law.

There are two separate prongs of causation a plaintiff must prove in a securities-fraud case: transaction causation and loss causation. *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 681–82 (5th Cir. 2015) (listing both as separate elements in a private 10b-5 action and discussing the requirements of each); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005) (listing transaction causation and

loss causation as separate and required elements of a 10b-5 claim).

Transaction causation is often equated to reliance, and typically involves proof of "but-for" causation—*i.e*, a plaintiff proves transaction causation "by showing that, but for the claim misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 171 (2008) ("Transaction causation, in turn, is often defined as requiring an allegation that but for the deceptive act, the plaintiff would not have entered into the securities transaction.").

Loss causation, on the other hand, is "[a]kin to a concept of proximate causation in tort law." *Ludlow*, 800 F.3d at 682. Loss causation requires proof of "a causal connection between material misrepresentation and the loss[.]" *Dura*, 544 U.S. at 341. A plaintiff "must prove that the misstatements . . . were the cause of her claim economic injury, unaided by any presumptions attending efforts to prove transaction causation." *Ludlow*, 800 F.3d at 682 (internal citations omitted). The fact that a stock's price may have been elevated because of a misstatement when purchased is not, in itself, sufficient to prove loss causation—a plaintiff must still show that "a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*, 563 U.S. 804, 812 (2011). A plaintiff fails to show loss causation if the price drop "could instead be the result of other intervening causes, such as 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events.'" *Id.* at 812–13 (quoting *Dura*, 544 U.S. at 342–43).

Loss causation is required, but not defined, by statute. *See* 15 U.S.C. § 78u-4(b)(4). A consistent principle in securities-fraud cases is that the required proof for loss causation should not

overlap with reliance evidence used to show transaction causation or reliance. *See Halliburton I*, 563 U.S. at 812 ("Loss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling stock."); *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (rejecting plaintiff's argument that loss causation could be satisfied by showing that the securities would not have been sold "but for" the defendant's fraud "because it collapses transaction causation with loss causation"). Instead, to prove loss causation, "a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered . . . [o]therwise, the loss in question was not foreseeable." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2016 WL 4095973, at *35 (S.D. Tex. Aug. 2, 2016) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)).

Here, Defendants argue that Plaintiffs have failed to prove loss causation because the misrepresentations they allege could not have caused their purported harm. Plaintiffs counter that they have satisfied the loss-causation requirement because they have showed they were "duped" into investing in Atherio at a price that was higher than represented. Doc. 156, Pls.' Resp., 49. Plaintiffs also point to evidence that they argue shows that Atherio's post-close failures and the subsequent price drop of their shares were caused, at least in part, by Farb's resignation as CFO. *Id.* at 49–50. Defendants reply that Plaintiffs impermissibly conflate loss causation with transaction causation and that Plaintiffs' evidence does not satisfy the proper standard for loss causation. Doc. 165, Cory's Reply, 23–28; Doc. 167, Farb & Furst's Reply, 7–11.

The Court will first discuss the proper loss-causation standard to apply here. To do so, it is important to note the distinction some courts have made between cases involving the sale of publicly

traded securities on an efficient market with cases dealing with privately traded securities. This case falls into the latter bucket.

The largest swath of cases from the Supreme Court and Fifth Circuit dealing with loss causation are fraud-on-the-market cases decided at the pleading stage.[11] For example, the seminal case on loss causation is *Dura Pharmaceuticals v. Broudo*, 544 U.S. 335 (2005). In *Dura*, the Court overruled the Ninth Circuit's loss-causation standard and held that a plaintiff cannot show loss causation in a fraud-on-the-market case by alleging, without more, that the price of a security on the date of purchase was inflated because of a misrepresentation. *Id.* at 338. Commenting more broadly on loss causation, the Court noted that the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a plaintiff prove "that the defendant's misrepresentations 'caused the loss for which plaintiff seeks to recover.'" *Id.* at 345–46 (quoting § 78u-4(b)(4)). The PSLRA, the Court clarified, "makes clear Congress' intent to permit privates securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.* at 346. The Court analogized the 10b-5 action to common-law claims for fraud, which have "long insisted that a plaintiff in such a case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss." *Id.* at 343–44. The Court ultimately held that the plaintiff's complaint was legally insufficient because it merely alleged that they "paid artificially inflated prices for Dura's securities and suffered damages." *Id.* at 347 (internal quotations and

---

[11] In *Basic Inc. v. Levinson*, the Supreme Court held that when "public information is reflected in the market price of the security . . . it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." *Stoneridge*, 552 U.S. at 159 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)). This is the "fraud-on-the-market" theory, which allows plaintiffs to take advantage of a rebuttable presumption that they relied upon defendants misrepresentations in purchasing the securities at issue to get past the transaction-cause element. Here, neither party argues the fraud-on-the-market presumption applies.

alterations omitted). The complaint, the Court found, needed to provide the defendant notice of "what the causal connection might be between [the relevant economic] loss and the misrepresentation . . . ." *Id.*

Thus, *Dura* generally directs that a plaintiff must prove loss causation in a 10b-5 action and that loss causation is not shown simply by alleging that the misrepresentation inflated the stock's price. But the Court constrained its holding in *Dura* to overruling the Ninth Circuit's loss causation test in fraud-on-the-market cases. *See id.* at 346 ("We need not, and do not, consider other proximate cause or loss-related issues."). The Court did not expound on what specifically is required to show that defendants' misrepresentations caused plaintiffs' economic loss. Nor did the Court distinguish the case before it—a fraud-on-the-market case—with other cases dealing with securities traded off the public market.

Decisions from the Fifth Circuit also seem to provide little guidance on what is needed to show loss causation outside of the fraud-on-the-market context. Before *Dura*, the Fifth Circuit held that, at the summary-judgment stage, a plaintiff can *prove* loss causation in a fraud-on-the-market case by showing that truthful corrective disclosures were related to previous misrepresentations and that the corrective disclosures resulted in price decreases. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 666 (5th Cir. 2004). Specifically, in *Greenberg*, the Fifth Circuit held that to prove loss causation a plaintiff must show:

> (1) that the negative "truthful" information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline.

*Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 666 (5th Cir. 2004). After *Dura*, the Fifth Circuit

reaffirmed the use of this test. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 255–56 & 256 n.20 (noting that *Greenberg*'s "related to" standard is consistent with *Dura*'s "relevant to" standard). But these cases, like *Dura*, are fraud-on-the-market cases. And the Court finds *Greenberg*'s loss-causation standard difficult to apply here; fraud-on-the-market cases focus on the effect a price-inflating misrepresentation and subsequent disclosure has on a security's price in the marketplace. Here, there was no marketplace for the disclosure of negative truthful information to cause a price decline. Instead, Plaintiffs argue being "duped into investing in a business that was less valuable than represented" caused their loss. Doc. 156, Pls.' Resp., 49.

The Court therefore lacks binding precedent on the issue of what is needed to show loss causation in a securities-fraud case not involving the purchase of publicly traded securities on an efficient market. *Cf. Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 944 n.1 (9th Cir. 2005) (holding that "*Dura* is not controlling" in case involving "private sale of privately traded stock"); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007) (finding the same, but still noting "the logic of *Dura* is persuasive" outside of fraud-on-the-market cases).

Courts in other circuits have considered this issue. The Third Circuit labels cases like this "non-typical § 10(b) actions"—compared to "typical" fraud-on-the-market § 10(b) actions. *McCabe*, 494 F.3d at 426. The *McCabe* court reasoned that "[i]t is more difficult to categorize the required loss causation showing in non-typical" cases because "the plaintiff does not simply allege that the price of a publicly-traded security has been affected." *Id.* at 425–26. As summarized by another Third Circuit panel, "in a *non-typical* case, the plaintiff's reliance interest is different because he acts due to a personalized misrepresentation . . . [that] do[es] not implicate larger market forces." *Pure Earth, Inc. v. Call*, 531 F. App'x 256, 260 (3d Cir. 2013) (citing *McCabe*, 494 F.3d at 426). Thus, the

*McCabe* court reasoned that "the factual predicates of loss causation fall into less of a rigid pattern" in nontypical cases. *McCabe*, 494 F.3d at 426. While it was clear to the panel that a plaintiff must separately prove transaction causation and loss causation, *id.* at 429–30, the Court found that the standards in *Dura* and other fraud-on-the-market cases were inapplicable—it would make little sense to require that a plaintiff in a private transaction show that a corrective disclosure to the market negatively affected the price of the privately held securities because misrepresentations are made in private cases to induce a specific party to enter into a transaction, not the public. *See Pure Earth*, 531 F. App'x at 260 (citing *McCabe*, 494 F.3d at 425–26).

The Third Circuit ultimately held that the general standard was the same for typical and nontypical cases: to prove loss causation, "the plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *Id.* at 426.

A summary of the facts in *McCabe* is useful because it is fairly similar to the case at hand. In *McCabe*, plaintiffs were shareholders of a closely-held company that was acquired by another company. *Id.* at 420. Plaintiffs exchanged their ownership interest for unregistered shares in the acquiring company. In the merger agreement, the acquiring company made a number of representations—*e.g.*, that their financial statements complied with GAAP and that there was no risk of legal action that could harm the merger—and Ernst & Young issued an opinion certifying that the acquirer's finances were prepared in accordance with GAAP. *Id.* at 421–22. After the merger closed, the acquirer ran into financial trouble and plaintiffs sold their stock in the acquirer for much less than they paid. *Id.* (describing how on the date the merger agreement was signed, the price was $8.69/share; the plaintiffs sold their stock in a private sale for $0.07/share).

Plaintiffs sued the acquiring company and Ernst & Young for securities fraud under § 10(b), common-law fraud, and negligent misrepresentation. *Id.* at 422 (noting that the acquiring company settled out). The claims were based on Ernst & Young's omission in its auditing opinion that the acquirer had been previously unable to meet obligations that resulted in the threat of litigation. *Id.* Plaintiffs claimed that the information should have been disclosed, as required by GAAP, and that they never would have closed the merger if they had known about it. *Id.* After discovery, Ernst & Young moved for summary judgment on all claims because plaintiffs only had evidence of transaction causation, but not loss causation. *Id.* at 423. The Third Circuit agreed, finding that "the factual record is devoid of sufficient evidence to create a genuine issue as to loss causation." *Id.* at 436. Specifically, the Court found that there was no evidence that "the falling price of [the acquirer's] stock was attributable to registration defaults and associated threats of litigation (the very facts omitted by Ernst & Young)." *Id.* at 438. Thus, because the plaintiffs could not point to evidence that "the very facts misrepresented or omitted by Ernst & Young were a substantial factor in causing" plaintiffs' economic loss, the Court affirmed summary judgment. *Id.*

Following *McCabe*, the Ninth Circuit has also distinguished between securities-fraud cases involving fraud on the market and those involving private sales. In *Nuveen*, the Ninth Circuit affirmed summary judgment against a plaintiff's securities-fraud claim for failing to prove loss causation. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1121 (9th Cir. 2013). Nuveen brought securities-fraud claims against the City of Alameda for misrepresentations made when Nuveen purchased notes from the city. The notes were issued to refinance debt and complete construction on a municipal telecommunications system. Revenue to repay the notes was to be secured from revenue generated by the new telecom system, and the

potential refinancing and sale of the system. But the system was a failure due to competition from competing telecom providers, combined with the 2008 recession. Nuveen lost around $10 million of its $20 million investment. Nuveen claimed that the city misrepresented and inflated the projected performance of the telecom system. Nuveen argued that "because the Notes would not have been issued 'but for' the City's fraudulent misrepresentations, the loss causation requirement is satisfied." *Id.* at 1121.

The Ninth Circuit rejected Nuveen's argument that "but for" causation was sufficient to prove loss causation, even in a case involving the sale of securities in an inefficient market. *Id.* The court rejected this argument because it "renders the concept of loss causation meaningless by collapsing it into transaction causation." *Id.* (quoting *McGonigle v. Combs*, 968 F.2d 810, 821 (9th Cir. 1992)). Despite the fact that the sale was on an inefficient market, the court found that Nuveen was still required to "reliably distinguish among the tangle of factors affecting a security's price." *Id.* at 1123. "Fundamentally," the court reasoned, "the same loss causation analysis occurs in both typical and non-typical § 10(b) cases." *Id.* (quoting *McCabe*, 494 F.3d at 425 n.2). In other words, evidence of but-for causation—that fraud induced the sale—was not enough. The Court affirmed summary judgment on loss causation because Nuveen failed to present evidence that "the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss." *Id.* at 1120 (citing *McCabe*, 494 F.3d at 429) (emphasis in original).

From these cases, the Court is persuaded that, in this case, the proper showing for loss causation—*i.e.*, the one that is most in line with the principles set forth in *Dura* and the above authority—is whether the plaintiff can show that the very facts the defendant misrepresented or

omitted were a substantial factor in causing the plaintiff's economic loss.[12]

Applied here, the Court finds Plaintiffs have not created a fact issue on loss causation. First, Plaintiffs argue that the Court should find they can satisfy loss causation "simply by showing [they were] duped into investing in a business that was less valuable than represented." Doc. 156, Pls.' Resp., 49 (quoting *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000). Defendants, in response, argue Plaintiffs misstate the law because they conflate loss causation with transaction causation. Doc. 165, Cory's Reply, 18–21; Doc. 167, Farb & Furst's Reply, 7–10. As the Court noted above, it seems to be clear that loss causation and transaction causation are separate elements that require different proof. Thus, it is not sufficient for a plaintiff to show she was "duped" or induced into a transaction to prove loss causation. Plaintiffs also argue that the "requirement that a plaintiff exclude the affect of market forces applies only to fraud-on-the-market cases." Doc. 156, Pls.' Resp., 49 (citing *Pure Earth*, 531 F. App'x at 261). The Court finds this also misstates the law—the securities-fraud statutes do not "provide investors with broad insurance against market losses." *Dura*, 544 U.S. at 345. And courts deciding cases outside the fraud-on-the-market context still hew close to this principle. *See Nuveen*, 730 F.3d at 1123 ("Because there are a tangle of factors that affect refinancing and sale, evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors."); *McCabe*, 494 F.3d at 425 ("The loss causation requirement limits the circumstances in which an investor can sue

[12] The Court notes that a pending petition for certiorari before the Supreme Court may affect the loss-causation standard and thus this case. *See First Solar, Inc. et al. v. Mineworker's Pension Scheme et al.*, No. 18-164. Courts can stay cases pending a higher court's ruling that may affect the case at hand. *See Rezko v. Xbiotech Inc.*, 2017 WL 4544683 (W.D. Tex. Oct. 6, 2017). But, *First Solar*, like *Dura*, is a fraud-on-the-market case that may not directly clarify the standard for loss causation to be applied here. And because the petition may yet be denied, the Court believes it is most efficient to grant summary judgment and allow the reviewing courts to address the issue of this potentially dispositive petition, if it ever arises.

over a failed investment, so that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with that investment.").

Plaintiffs alternatively argue that Defendants' misrepresentations were "at least partly" the cause of Plaintiffs' loss because they went to the viability of Atherio as a business. Doc. 156, Pls.' Resp., 49–50. Plaintiffs cite a few pieces of evidence to support their argument:

(1) Atherio failed to properly manage its debt without Farb as CFO;

(2) If Farb had stayed on as CFO, Atherio would not have lost two purported investors, which contributed to Atherio's collapse; and

(3) If Farb was CFO he would have prevented Cory from committing fraud and damaging the company.

*Id.* Because of the Court's previous ruling on the nonreliance clause, *see* Doc. 152, Mem. Op. & Order, the Court considers only the facts underlying intracontractual misrepresentations. Thus, as an initial matter, the Court agrees with Defendants that Plaintiffs' argument that the "Defendants' representation of a competent management team" has no bearing here because this is not a representation in the Agreement. The Court will not consider any arguments based on representations made outside the Agreement.

Turning to the relevant misrepresentations, the Court first considers Plaintiffs' allegation that Defendants misrepresented Farb's continued role with Atherio post-close. For Plaintiffs to show loss causation as to this misrepresentation, Plaintiffs must show that Farb's resignation as CFO was at least a substantial factor in bringing about their economic loss—*i.e.*, the devaluation of Atherio. *Nuveen*, 730 F.3d at 1120; *McCabe*, 494 F.3d at 429. Plaintiffs cite a few pieces of evidence to support this claim. First, Plaintiffs point to an email written by Farb, dated June 27, 2013—on or shortly after the Agreement closed—in which Farb allegedly admitted that the management team

of Atherio was unprepared to run the company. Doc. 156, Pls.' Resp., 50 (citing Doc. 151-5, Pls.' App'x, 1147). Plaintiffs seem to be referring to Farb's statement in the email that Atherio's officers "have been so focused on the deal side and the financing, we haven't done any planning for when we own the companies." Doc. 151-5, Pls.' App'x, 1147. It is unclear how this email would show that Farb's resignation as CFO post-close would cause Atherio to collapse—on the other hand, as Defendants point out, this may actually belie Plaintiffs' argument that Farb's resignation was a cause of their loss. Specifically, this seems to be more of a gripe with Farb's performance as CFO. And other arguments Plaintiffs make in their response betray their contradicting position here—*e.g.*, their claim in the very next page of the response that "Farb willfully prepared financial statements that concealed his resignation, failed to disclose Atherio's Severance Obligation, and therefore violated GAAP." Doc. 156, Pls.' Resp., 51 (citing Doc. 37, Pls.' Am. Compl., ¶¶ 154–64). It is illogical for Plaintiffs to argue on the one hand that Farb was improperly "manipulating financial data" to misrepresent Atherio's performance and, on the other hand, insist that Farb as CFO was a necessary element to Atherio's success.

Plaintiffs' additional evidence that Farb's alleged resignation was the cause of Atherio's collapse is likewise unavailing. Plaintiffs contends that "Farb's departure caused two 'high probability' investors to back out, impairing Atherio's ability to perform the basic business functions of accumulating capital." Doc. 156, Pls.' Resp., 50. Plaintiffs support this with an email from Farb to Cory relaying Farb's discussions with potential investors. Doc. 151-4, Pls.' App'x, 590–91. While Farb did tell Cory that one investor was "high probability to invest" but he appeared to be backing out with Farb leaving, Farb also told Cory the investor was concerned that another officer, Mark Dinkel, appeared to be backing out. *Id.* Farb concluded "Jason, I think there is a message here—pull your

team together and get Mark firmly in the company." The second investor (who planned to contribute only $30,000) similarly expressed concern about Farb leaving Atherio, but was also "very put off" by an unrelated press release sent out by Atherio. *Id.* In sum, this email alone is insufficient to support Plaintiffs' argument that alleged Farb's title change caused these investors to back out—let alone led to Atherio's demise. Plaintiffs have pointed to no other evidence that shows (1) that these investors did, in fact, back out, (2) that other intervening causes (such as Cory's inability to pull a team together) did not overpower any effect Farb's alleged resignation had on this one investor, and (3) that Atherio's failure—and thus Plaintiffs' economic loss—occurred *because* these investors did not sign on. Moreover, another issue with Plaintiffs' argument is that Defendants' evidence shows Farb continued to work at Atherio for months after the close. Doc. 145, Cory's App'x, 297–98. And his role at Atherio appeared to be the same in those months. *Id.* at 299–301. This undercuts any argument that the investor backed out because Farb left Atherio.

Plaintiffs next argue that Farb would have prevented Cory from committing bank fraud if he were CFO at the time Cory submitted inflated receivables to their lender. Doc. 156, Pls.' Resp., 50. The Court notes, again, that this position contradicts Plaintiffs' previously stated position that Farb fraudulently prepared financial statements in violation of GAAP, *see id.* at 51, and concealed monetary obligations from Plaintiffs. Furthermore, the Court finds Plaintiffs' contention that "Farb would have prevented" Cory from submitting fraudulent documents to Sun Trust highly speculative. The deposition testimony Plaintiffs cite for this argument actually reveals that Farb was aware of Cory's actions and "went and counseled Jason repeatedly to go to the banks immediately, advise them that we were in default, which we're required to do." Doc. 151-5, Pls.' App'x, 720 (Depo. of Thomas Farb). And Farb then testified that he resigned *because of* Cory's behavior, as well as

reported his actions to "the board and Prudent and Sun Trust." *Id.* Thus, Farb never testified, as Plaintiffs claim, that he would have prevented Cory from committing fraud; instead, Farb did as he said, and resigned as CFO because he was unwilling to help Cory. Further, it is merely speculative that Farb would have done anything different as CFO of the company, compared to his position as an executive vice president at the time Cory committed the fraud.

Lastly, the Court finds Plaintiffs' weakest argument supporting loss causation relates to the hypothetical severance obligation owed to Farb. As discussed in the background section, it is clear that Farb and Atherio entered into an agreement to shift the amount of severance he was owed to another Atherio entity. There is a fact issue over why this was done. But even if the Court assumes the worst—that the severance obligation was fraudulently concealed from Atherio's books to facilitate the close of the Agreement—it is equally clear that this severance obligation was never paid. And because the obligation to Farb was never paid, Atherio's value could not have been affected by it. Thus, the facts underlying the fraud—the existence of this undisclosed liability—could not have been a substantial factor in causing Plaintiffs' economic loss. Plaintiffs attempt to argue, without evidence, that the fact that this obligation wasn't paid is proof that Atherio was poorly managed, unable to meet its obligations, and heading towards failure with Cory at the helm. Doc. 156, Pls.' Resp., 50. But "bare assertions, conclusory allegations or suspicions" are not sufficient to create a fact issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). And further, it is a basic tort principle that "an intervening act of a third party [here, Cory], which actively operates to produce harm after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable for the harm which his antecedent wrongful act was a substantial factor in bringing about." *McCabe*, 494 F.3d at 436 (citing Restatement (Second) of Tort

§§ 440–41). Even if Atherio's failure to pay Farb's severance obligation was the result of mismanagement (which Plaintiffs have not shown), Cory's wrongful acts as CEO of Atherio would seem to be a superseding cause to the demise of Atherio and any economic loss Plaintiffs suffered.

Because Plaintiffs have not brought forth evidence that creates a genuine issue of material fact as to loss causation, the Court grants Defendants' motions for summary judgment on Plaintiffs' securities-fraud claim.

*iv.    Damages*

Defendants Farb and Furst argue Plaintiffs have failed to prove damages for their securities-fraud claim. Doc. 140, Farb & Furst's Mot. Summ. J., 19–20. They claim this is so because Plaintiffs have not provided admissible evidence on the value of the Atherio shares they received when they sold their company. Farb and Furst further contend that Plaintiffs' nonretained experts are not qualified to testify on Atherio's valuation.

The Court will not reach the issues of which damages theory is appropriate here or of whether Plaintiffs have adduced sufficient evidence of damages to survive summary judgment because it has already found that Plaintiffs have failed to show Defendants' alleged acts caused them any loss.

C.    *Common-Law Fraud Claim*

A fraud claim under Delaware law has similar elements to a securities-fraud claim.[13] A plaintiff must prove: (1) a false representation; (2) the defendant's knowledge of the falsity of the statement, or reckless indifference to the truth; (3) the defendant's intention for the plaintiff to rely

---

[13] *See Dura*, 544 U.S. at 343 ("Judicially implied private securities fraud actions resemble in many (but not all) respects common-law deceit and misrepresentation actions."); *Id.* at 346 ("The statute thereby makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss.").

on the representation; (4) the plaintiff's justifiable reliance on the representation; and (5) the plaintiff's incurrence of causally related damages.[14] *Vichi v. Koninklijke Elec., N.V.*, 85 A.3d 725, 807 (Del. Ch. 2014).

Defendants make the same arguments and cite the same evidence for summary judgment against the Delaware fraud claim that they do for the securities-fraud claim. Based on the similarity of the law, the Court finds its analysis of Defendants' respective arguments against Plaintiffs' 10b-5 claim equally applicable here. The Court thus grants summary judgment on Plaintiffs' common-law fraud claim on the grounds that Plaintiffs have no evidence that Defendants' misrepresentations caused their loss. *See* Part III.B.iii. *supra*.

D. *Affirmative Defenses*

Although the Court has granted summary judgment on Plaintiffs' securities and common-law fraud claims, the Court addresses the following affirmative defenses. The Court will not grant summary judgment on these defenses.

i. *Statute of Limitations—10b-5 Claim*

---

[14] Like securities-fraud claims, Delaware courts require plaintiffs to show two forms of causation: (1) factual causation (or but-for causation) and (2) legal causation (or proximate causation). *See Vichi*, 85 A.3d at 815–16. The parties dispute what is required to satisfy the causation element. Defendants argue the causation element requires something similar to loss causation in the securities-fraud context; Plaintiffs argue that they only need to show they entered into an agreement they otherwise would not have signed. Doc. 156, Pls.' Resp., 42 n.24 (citing *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015)). Defendants argue Plaintiffs' cases discuss only the pleading standards for fraud claims, not the standard of proof at summary judgment. Doc. 167, Farb & Furst's Reply, 11. The Court agrees with Defendants that *Vichi* better captures what a plaintiff must show to prove causation at trial. *Vichi*, 85 A.3d at 821–22 (holding plaintiff had not proven the "loss causation component of legal or proximate causation" by a "preponderance of the evidence") (quotations omitted). As with their securities-fraud claim, Plaintiffs must prove Defendants alleged fraud was the legal cause of their loss. *Cf. McCabe*, 494 F.3d at 438–39 (finding 10b-5 loss causation requirement similar to that of New Jersey's common-law fraud claim and granting summary judgment against both claims for failure to show that element).

Cory moves for summary judgment on the ground that Plaintiffs' securities-fraud claim is barred by the statute's two-year limitations period. Doc. 144, Cory's Br. Summ. J., 42–43. Cory argues this is the case because there is evidence that shows Plaintiffs were aware or should have been aware that Farb was no longer the CFO of Atherio in 2013—more than two years before they filed suit in 2016. *Id.* at 43. In response, Plaintiffs point to conflicting evidence that seems to indicate that they did not learn that Farb had resigned until a separate proceeding was initiated in January 2015, which would be within the two-year limitations period. Doc. 156, Pls.' Resp., 47.

Private securities-fraud claims under Rule 10b-5 must filed within two years after the discovery of a violation. 28 U.S.C. § 1658(b). The Supreme Court has made clear that in private securities-fraud cases, "a cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation.'" *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010) (quoting 28 U.S.C. § 1658(b)(1)). Facts constituting the violation "include the fact of scienter." *Id.*

Cory points to portions of Plaintiffs' depositions as evidence that Plaintiffs were aware, or should have been aware with reasonable diligence, of the facts constituting the violation. First, Cory cites Stewart's deposition as evidence Stewart knew Farb had resigned shortly after the close in July 2013. Doc. 144, Cory's Br. Summ. J., 51. When asked when he learned that Farb was no longer CFO of Atherio, Stewart stated: "Probably July [2013] when they couldn't pay our bills. We knew that we didn't have anyone running the financial back office of Atherio. . . . [A]nd they told us he had left and they were looking for a controller." Doc. 145-13, Cory's App'x, 280–81 (Stewart's Depo.). And when asked "so almost immediately after the close, you learned that Farb was no longer CFO," Stewart responded: "I was told Farb wasn't there, that he had resigned and he was gone. And they

immediately started falling apart." *Id.* at 281.

Cory next points to portions of O'Connor's deposition. When asked when she learned of Farb's resignation, O'Connor responded: "Let's see. We sold at the end of June 2013. I can't specifically give you a date and time. Potentially that fall. I honestly—again, it was five years ago. I honestly don't know the answer to it." *Id.* at 194. When asked if she learned about Farb's title change before April 2014 (which would be more than two years before this suit was filed), she responded "Yes." *Id.*

In response to this, Plaintiffs provide contradictory testimony from Stewart's deposition. When asked when he learned that Farb resigned, he testified: "We figured out he resigned somewhere at the beginning of the 202 [proceeding] when we started reading his resignation papers." Doc. 156-5, Pls.' App'x, 863. Because that proceeding was initiated in January 2015, Plaintiffs argue the lawsuit was timely. Stewart also testified he never learned about the "side agreements" involving Farb's severance obligation until discovery during this litigation. *Id.* at 864.

Reviewing the arguments and evidence presented by the parties, the Court finds there is a genuine fact issue as to when this cause of action accrued. This issue is best reserved for the factfinder, and the Court therefore will not grant summary judgment on the limitations defense.

ii.      *Cory's Release Defense*

Cory next insists that he alone is entitled to summary judgment because Plaintiffs released their claims against him in a previous agreement (the "Release"). Doc. 144, Cory's Br. Summ. J., 12–17. Plaintiffs, in response, argue that they are not bound by the Release because they never signed it or agreed to be bound by it, and that they never gave anyone authority to sign it on their behalf. Doc. 156, Pls.' Resp., 47–48. Cory counters that (1) Furst had both actual and apparent authority

to enter into the Release on Plaintiffs' behalf and (2) Plaintiffs should be bound by the Release because they had knowledge of and accepted benefits from that agreement. In their surreply, Plaintiffs argue that (1) Furst's testimony is inadmissible and should be not be considered and (2) while they may have had knowledge that an agreement was being reached to allow Cory to depart from Atherio, they did not know it involved a release of claims. Doc. 174-1, Pls.' Surreply.

The Court will not reach this issue at this time. Because the Court is granting summary judgment against Plaintiffs' claims and because Cory has a counterclaim remaining based on the Release (Doc. 161) that the Court is unwilling to resolve on these motions, the Court will instruct the parties, in an order to follow, on how to proceed with this issue.

E.    *Claims Sounding in Contract, Not Tort*

Farb and Furst's final argument is that Plaintiffs' claims should be dismissed because they sound in contract, not tort. Doc. 140, Farb & Furst's Mot. for Summ. J., 20–21. Plaintiffs respond first by noting that the parties contractually agreed that Plaintiffs could bring a fraud claim without being subject to a "bootstrapping" argument. Doc. 156, Pls.' Resp., 55–56. Plaintiffs respond second by asserting that their fraud claims arise from Defendants breach of a separate tort-law duty. *Id.* The Court finds that Plaintiffs have not bootstrapped a fraud claim here. While what remains of Plaintiffs' claims are misrepresentations that occur solely within the Agreement, much of the allegedly fraudulent activity occurred before the Agreement was made and was secreted away from Plaintiffs to induce them to enter into the transactions. And, if true, these allegations "go beyond a mere intention not to comply with the terms of the Agreement." *Novipax Holdings LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *14 (Del. Super. Ct. Nov. 28, 2017) (rejecting bootstrapping claim); *see also Osram Sylvania*, 2013 WL 6199554, at *16 (rejecting bootstrapping claim based on defendants

precontractual fraudulent conduct). The Court does not grant Farb and Furst's summary-judgment motion on this ground.

## IV.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendants' motions for summary judgment (Doc. 140 & 142). Specifically, the Court rules as follows:

1. The Court **GRANTS** summary judgment against Plaintiffs' securities-fraud claim because they failed to show that Defendants were the legal cause of their alleged loss. *See* Part III.B.iii. *supra.*

2. The Court **GRANTS** summary judgment against Plaintiffs' common-law fraud claim because they failed to show that Defendants were the legal cause of their alleged loss. *See* Part III.C. *supra.*

3. The Court **GRANTS** Defendants' motions on Plaintiffs' equitable-fraud claim and against Plaintiffs' fraud claims as they relate to § 4.3 of the Agreement because Plaintiffs have failed to adequately plead such claims. *See* Part III.A.i–ii. *supra.*

4. The Court does not grant summary judgment on the affirmative defenses raised by Defendants.

Though the Court has refused to grant summary judgment on the defenses raised by Defendants, the result of this Order is that all Plaintiffs' claims are **DISMISSED**.

Additionally, in relation to this Order, Defendant Cory's Motion to Exclude the Testimony of Plaintiffs' Expert Beverly Byers (Doc. 155) is **DENIED**. Cory's Motion for Leave to File Evidence included in the Appendix to his Reply Brief (Doc. 175) is **GRANTED**. Plaintiffs' Motion to Strike, For Leave to File Surreply, and to Add Additional Evidence (Doc. 174), is **GRANTED, in part, and DENIED, in part**—the Court will not strike Cory's Reply, but grants Plaintiffs' leave to file their surreply and additional evidence attached to Doc. 174.

SO ORDERED.

SIGNED: January 3, 2019.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE