# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

JASON CORY,                    §
                               §
   Plaintiff,               §
                               §
v.                             §    CIVIL ACTION NO. 3:16-CV-1731-B
                               §
TAMMY O'CONNOR and MICHAEL      §
STEWART,                       §
                               §
   Defendants.              §

## MEMORANDUM OPINION AND ORDER

One issue remains in this case—whether Defendants Tammy O'Connor and Michael Stewart can be bound and held liable for breaching a contract they never signed. The Court previously granted summary judgment against O'Connor and Stewart on all of their claims relating to the sale of their company to Atherio, Inc. Doc. 211, Mem. Op. & Order. But the Court did not reach the issue of now-Plaintiff Jason Cory's counterclaim against Defendants. Cory's counterclaim asserts that O'Connor and Stewart breached a different agreement—the Omnibus Compromise and Release Agreement (the "Omnibus Agreement")—that entitles Cory to damages and attorneys' fees incurred in defending against O'Connor and Stewart's original claims. *See* Doc. 161, Cory's Answer & Countercl., ¶¶ 350–73. The Omnibus Agreement was entered into by Cory, Atherio (through its representatives), and a related party to, among other things, terminate Cory's employment with Atherio. The Omnibus Agreement also contained terms under which Cory, Atherio, and other Atherio parties would release any claims they had or might have had against each other. O'Connor

and Stewart—Atherio shareholders at the time—did not sign the Omnibus Agreement. But Cory nonetheless argues they should be bound by this release provision because (1) their agent had authority to bind them to the Omnibus Agreement or (2) they accepted the benefits of the Omnibus Agreement. The parties have filed crossmotions for summary judgment on these issues. After reviewing the briefing, the Court **DENIES** Cory's motion for summary judgment (Doc. 218) and **GRANTS** Defendants O'Connor and Stewart's motion for summary judgment (Doc. 216). Because no other issues remain in this matter, a final judgment will follow this Order.

## I.

## BACKGROUND

The factual background of this case has been recounted in the Court's prior opinions (Docs. 100, 109, 152, & 211). The Court discusses only the facts pertinent to the remaining issues in the case.

Tammy O'Connor and Michael Stewart sold their ownership interests in their technology company to Atherio, Inc. in June 2013. Doc. 224, Defs.' Resp., 3. At the time of this transaction, Jason Cory was Atherio's chief executive officer. Doc. 219, Cory's Br. Summ. J., 2. In January of 2014, a dispute arose between Cory and Atherio's other executives based on allegations of potential company mismanagement. *Id.*; Doc. 224, Defs.' Resp., 3. Atherio's board placed Cory on unpaid leave, and Cory and the Atherio executives began negotiating a resolution. Doc. 224, Defs.' Resp., 3–4. In May of 2014, Atherio, Cory, and Prudent Capital (Atherio's mezzanine lender) reached an agreement on the terms of Cory's exit from Atherio—the Omnibus Agreement. Doc. 217, Defs.' Br. Summ. J., 1; Doc. 217-4, Defs.' App., 256–269.

Relevant to this Order, § 15 of the Omnibus Agreement provides:

> Atherio Parties' Cory Parties Release: Expressly subject to <u>Section 15.1</u> hereof (which obligations are expressly not released hereby), upon the Effective Date, Atherio, any Affiliate of Atherio, ***and any Atherio Party hereby release, remise, and forever discharge Cory and the Cory Parties from any and all rights, claims, demands, Actions, causes of action, losses, expenses and judgments***, whether known or unknown, suspected or unsuspected, accrued or not accrued, to which Atherio, any Affiliate of Atherio, or the Atherio Parties have, may have, or may claim to have against, Cory or any of the Cory Parties provided, however, that Atherio, any Affiliate of Atherio, and any Atherio Party does not waive, relinquish or may release any of its rights or any of the obligations of Cory, arising out of this Agreement.

Doc. 217-4, Defs.' App., 262 (emphasis added). A previous section of the Omnibus Agreement defines "Atherio Parties" as "shareholders (including Furst, Farb, Dinkel, Tammy O'Connor, Michael S. Stewart, and Pickett)." *Id.* at 261.

The Omnibus Agreement was signed and executed in May of 2014 by Cory, Greg Furst—on behalf of Atherio as its CEO at the time—and Steven Schwartz, on behalf of Prudent Capital. *Id.* at 267–69. It is undisputed that O'Connor and Stewart did not sign the Omnibus Agreement. Doc. 217, Defs.' Br. Summ. J., 1; Doc. 219, Cory's Br. Summ. J., 1. In fact, they argue that they never saw the Omnibus Agreement until a subsequent legal proceeding in 2015. *Id.* at 7. O'Connor and Stewart argue that until they saw the agreement in that proceeding, they never knew it included a term (§ 15) that purported to release their personal claims against Cory. *Id.*

Cory, on the other hand, argues that Furst had the authority to bind O'Connor and Stewart to the Omnibus Agreement based on discussions he had with them. Doc. 219, Cory's Br. Summ. J., 5–6 (citing Furst's Dep.). Alternatively, Cory claims that the Omnibus Agreement included provisions that benefitted the Defendants, such as an indemnification provision, and that they

accepted these benefits. *Id.* at 6–7. Finally, Cory argues that O'Connor and Stewart are liable to him for damages and attorneys' fees because they violated the release provision cited above and breached the Omnibus Agreement when they originally brought this suit against him. *Id.* at 15–17.

On January 18, 2019, both sides filed crossmotions for summary judgment on Cory's breach of contract claim. Cory filed his motion for summary judgment (Doc. 218), in which he asserts O'Connor and Stewart are bound by the Omnibus Agreement as a matter of law. O'Connor and Stewart filed their motion for summary judgment on the same issue, in which they argue that Cory has failed to create a genuine issue of material fact on his theories of liability. Both motions have been fully briefed, and the Court now considers whether O'Connor and Stewart can be bound by this agreement.

## II.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The summary-judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). But if the non-movant ultimately bears the burden of proof at trial, the movant may satisfy its burden just by pointing to the absence of evidence supporting the non-movant's case. *Id.* at 322–23.

If the movant meets that burden, then it falls to the non-movant to "show with significant probative evidence that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (internal quotation marks omitted) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). And significant probative evidence is just that: significant. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam). "[M]etaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not do. *Id.* (internal citations and quotation marks omitted). Rather, "the non-movant must go beyond the pleadings and present specific facts indicating a genuine issue for trial." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (citing *Celotex*, 477 U.S. at 324).

To be sure, the court views evidence in the light most favorable to the non-movant when determining whether a genuine issue exists. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). The presence of crossmotions does not change this approach: The court will "review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001). But it need not "sift through the record in search of evidence to support a party's opposition to summary judgment."

*Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)). Simply put, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Id.* If it cannot, then the court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

The Court must decide if O'Connor and Stewart—nonsignatories to the Omnibus Agreement—can nonetheless be bound by it and held liable for breaching it. The Court asked the parties to address which principles of law would support such liability. Doc. 213, Status Report Order. Cory argues that O'Connor and Stewart can be held liable under (1) agency law or (2) a ratification/adoption theory. Doc. 219, Cory's Br. Summ. J., 1. The Court addresses each theory in turn.

### A.    *Agency Theory*

The issue under this theory is whether Greg Furst, as an agent of O'Connor and Stewart, had their authority to bind them to the Omnibus Agreement. Under Texas law,[1] "[a]n agent cannot bind

---

[1] The parties initially dispute whether Texas or Delaware law should apply to this remaining issue. *See* Doc. 217, Defs.' Br. Summ. J., 8 (arguing Texas law applies); Doc. 226, Cory's Resp. Br., 3–4 (arguing that Delaware law applies, but that he prevails under either states' laws). But because neither side points to a difference or conflict between the states' laws, the Court will apply the law of the forum state, Texas. *See Lloyd's Syndicate 457 v. Am. Glob. Mar. Inc.*, 346 F. Supp. 3d 908, 928 (S.D. Tex. 2018) ("The law of the forum state applies if there is no conflict between the substantive state law." (citing *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002))). Even so, the Court would apply Texas law under Texas choice-of-law rules because the Court agrees with Defendants that Texas has the most significant relationship to this remaining issue. Doc. 217, Defs.' Br. Summ. J., 12.

a principal absent either actual or apparent authority." *Sanders v. Total Heat & Air, Inc.*, 248 S.W.3d 907, 913 (Tex. App.—Dallas 2008, no pet.). "Texas law does not presume agency, and the party who alleges it has the burden of proving it." *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 597 (Tex. 2007). "An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007).

The Court will first determine whether the summary-judgment evidence supports a finding of actual authority and then whether the evidence supports a finding of apparent authority.

### i.　Actual Authority

Cory contends there is sufficient evidence to find that Furst had actual authority to bind O'Connor and Stewart to the Omnibus Agreement. Doc. 219, Cory's Br. Summ. J., 8; Doc. 226, Cory's Resp., 4–5. O'Connor and Stewart argue the opposite. Doc. 217, Defs.' Br. Summ. J., 12–15.

"Actual authority refers to responsibility a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses." *Expro Ams., LLC v. Sanguine Gas Expl., LLC*, 351 S.W.3d 915, 921 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). "Actual authority is created through conduct of the principal communicated to the agent." *Tex. Cityview Care Ctr., L.P. v. Fryer*, 227 S.W.3d 345, 352 (Tex. App.—Fort Worth 2007, pet. dism'd [mand. dism'd]). Moreover, actual authority "includes both express and implied authority." *Reliant Energy Servs., Inc v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 783 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "Express authority is delegated to an agent by words of the principal that expressly and directly authorize the agent to

do an act or series of acts on behalf of the principal." *Id.* (citing *Crooks v. MI Real Estate Partners, Ltd.*, 238 S.W.3d 474, 483 (Tex. App.—Dallas 2007, no pet.)). "Implied authority is the authority of an agent to do whatever is necessary and proper to carry out the agent's express powers." *Id.* "Implied agency therefore exists only as an adjunct to express actual authority; an agent that does not have express authority cannot have implied authority." *Id.*

At the outset, the Court notes that it does not appear that Cory is arguing that O'Connor and Stewart gave Furst their *explicit* actual authority to enter into a release of their claims. This accords with the available evidence—Cory has brought forth no evidence that shows Furst, O'Connor, and Stewart discussed a release of claims. To the contrary, Furst even testified that he was not the one that would have discussed a release with O'Connor and Stewart before the Omnibus Agreement was executed. *Id.* at 322–24 (Furst Dep.). And O'Connor and Stewart have declared that no such conversations occurred. Doc. 217-5, Defs.' App., 289–90 ¶¶ 3–5 (Decl. O'Connor) and 293–94 ¶¶ 3–5 (Decl. Stewart). Thus, Cory's evidence does not support a theory of actual authority where O'Connor and Stewart expressly authorized Furst to release their claims.

Instead, Cory argues the evidence supports a two-step theory of actual authority: first, Cory argues that O'Connor and Stewart gave Furst the express actual authority to execute an agreement whereby Cory would resign from Atherio and indemnify O'Connor and Stewart (the Omnibus Agreement). Second, Cory argues that through this express authority to enter into this agreement, Furst, had the implied authority to release any claims O'Connor and Stewart may have had against Cory.

In support of this theory of actual authority, Cory relies on Furst's testimony to establish that Furst reasonably believed he had the authority to sign the Omnibus Agreement on behalf of O'Connor and Stewart. Doc. 219, Cory's Br. Summ. J., 8–9. Furst was asked in his deposition: "Is it your testimony that Ms. O'Connor and Mr. Stewart had conversations with you where they conveyed that they wanted Mr. [Cory] gone from Atherio?"; Furst responded, "Correct." *Id.* (citing Doc. 220, Cory's App. (Ex. C), 32–34). Furst further testified that these meetings occurred before the Omnibus Agreement was signed and that he discussed the Omnibus Agreement with O'Connor and Stewart. *Id.* Furst testified that Stewart and O'Connor never objected to his negotiations of the Omnibus Agreement with Cory. *Id.* From this and Furst's understanding that he had the authority to execute the Omnibus Agreement via Atherio's board of directors and shareholders, Furst believed he had the authority to sign the Omnibus Agreement on O'Connor and Stewart's behalf. *Id.*

O'Connor and Stewart attack the sufficiency of this evidence supporting Cory's theory of actual authority.[2] First, they assert that Cory has brought forth no evidence that they gave Furst their express authority to release their claims. Specifically, they argue that Furst's testimony only shows that he had many discussions with O'Connor and Stewart about their desire to remove Cory from

---

[2] O'Connor and Stewart also make a number of evidentiary objections to Cory's use of Furst's deposition testimony. O'Connor and Stewart argue Furst's testimony is inadmissible because Furst lacked personal knowledge of discussions that might have occurred between himself and O'Connor and Stewart regarding the release provision. Doc. 217, Defs.' Br. Summ. J., 13 (citing Fed. R. Evid. 602). Furst testified that "there is no way I would have negotiated things like indemnification or releases," in the Omnibus Agreement, and that those negotiations took place between Atherio's and Cory's lawyers. *Id.* Further, Furst testified that he did not recall discussing the release language with O'Connor and Stewart. *Id.* (citing Doc. 217-5, Defs.' App., 334 (Furst's Dep.)). O'Connor and Stewart also make hearsay objections to portions of Furst's testimony regarding discussions O'Connor and Stewart's attorney may have had with them about the release. *Id.* (citing Fed. R. Evid. 802 & 805). The Court does not rule on these objections at this time, but instead finds that even if Cory's evidence were admissible, it is insufficient to create fact issues on his theories of liability.

Atherio and about the Omnibus Agreement generally; but, they point out, Furst did not testify that they had discussions about the release provision itself. Doc. 228, Defs.' Reply, 6–8; *see also* Doc. 224, Defs.' Resp., 11. And, as noted, Furst testified he was not involved in negotiating the specific release provision and did not know if the parties involved in the negotiations (the lawyers) ever discussed the release with O'Connor and Stewart before the Omnibus Agreement was signed. Doc. 224, Defs.' Resp., 11. As for Cory's argument that Furst thought he had authority to release their claims because they never objected, O'Connor and Stewart counter that they could not have objected because they did not have knowledge of the release provision. Doc. 228, Defs.' Reply, 1–2 (citing Doc. 217-5, Defs.' App., 289–90 ¶¶ 3–5 (Decl. O'Connor) and 293–94 ¶¶ 3–5 (Decl. Stewart)). Indeed, they have declared that they never saw the Omnibus Agreement, including the release provision, before it was executed. *Id.* They have also declared they had no knowledge of it until sometime after it was executed. *Id.* Cory has provided no evidence contradicting or discrediting these sworn statements.

Ultimately, the Court finds that O'Connor and Stewart have the better side of this argument. Actual authority must be created through the words or conduct of the principal communicated to the agent. *Sanders*, 248 S.W.3d at 913. And Cory has brought forth no evidence showing that O'Connor and Stewart gave Furst any authority to release their claims against Cory.

"An agent has express authority when the principal makes it clear to the agent that it wants certain acts done." *Crooks*, 238 S.W.3d at 483. As summarized above, Cory has not presented evidence that O'Connor or Stewart ever made it clear that they wanted Furst to enter into an agreement that effectuated the release of their claims against Cory. At best, Cory's evidence creates a fact issue as to whether O'Connor and Stewart gave Furst their authority to sever Cory's

relationship with Atherio. But even this is only supported by: (1) an email Stewart wrote to Furst that included an attachment stating "Jason [Cory] out of our way—total waste of time!" and (2) Furst's testimony that he concluded that he had this authority based on general discussions he had with Stewart and O'Connor about that Omnibus Agreement. Doc. 220, Cory's App., 70 (email); Doc. 228, Defs.' Reply, 9. First, the only thing this email establishes is that Stewart was pleased that Cory, whose independent legal troubles were a distraction, was going to be out of the company. *See* Doc. 220, Cory's App., 70; Doc. 217-5, Defs.' App., 289–90, 293–94. This statement cannot be fairly interpreted as an express and direct instruction to agent to accomplish an act on their behalf. *See Crooks*, 238 S.W.3d at 483. As for Furst's testimony, Cory argues that it shows O'Connor and Stewart "instructed" Furst to remove Cory from Atherio. Doc. 226, Cory's Resp., 3. Not so. Furst's testimony shows only that O'Connor and Stewart indicated to him that they "wanted [Cory] gone from Atherio." Doc. 217-5, Defs.' App., 340–41. It does not show that they "expressly and directly authorize[d]" Furst to remove Cory from the company on their behalf. *LandAm. Commonwealth Title Co. v. Wido*, 2015 WL 6545685, at *5 (Tex. App.—Dallas Oct. 29, 2015, no pet.).

Cory's argument is also belied by the fact that Furst did not appear to *need* O'Connor or Stewart's authority to remove Cory from the company. Furst himself testified that he believed he had the authority to execute such an agreement "through the board and the shareholders." Doc. 217-5, Defs.' App. (Furst Dep.), 342, 59:2–6. But Cory has provided no evidence that O'Connor and Stewart were necessary to that grant of authority from the shareholders and board. In fact, it appears from Atherio's Bylaws and Shareholder Voting Agreement that O'Connor and Stewart were not entitled to vote on the removal of Atherio's directors because they did not possess the right category

of Atherio shares. *See* Doc. 224-1, Defs.' Resp. App., 22 (Atherio's Bylaws providing that only Class A shareholders could vote to remove directors), 27–28 (Atherio's Shareholder Voting Agreement providing for the same); Doc. 230-1, Defs.' Surreply, 2.[3] Without support, Cory asserts Preferred Series A shareholders—*e.g.*, O'Connor and Stewart—were required to approve the removal of directors. Doc. 229, Cory's Reply, 6 n.6. But neither the Voting Agreement nor the Bylaws supports this assertion, and Cory has adduced no other evidence that does.

Cory also argues that a Written Consent signed by Atherio shareholders, including O'Connor and Stewart, shows that they did in fact vote on Cory's removal from Atherio. *Id.* The Court has examined the Written Consent and concludes that it does not necessarily show that O'Connor and Stewart voted to remove Cory. Doc. 230-2, Surreply App., 3–8 (Written Consent). Instead, the Written Consent states quite clearly that the "Majority Stockholder," being the record holder of a majority of the voting power of outstanding Class A shares, found it necessary to remove the existing Atherio directors. *Id.* at 3–4. O'Connor and Stewart, as Preferred Series A shareholders, signed the agreement only "*to the extent required*" to adopt the resolution. *Id.* at 3 (emphasis added). Because the

---

[3] O'Connor and Stewart moved for leave to file a surreply after Cory argued in his reply that an agreement existed—the "Written Consent of Shareholders"—under which O'Connor and Stewart allegedly voted to remove Cory from Atherio's board. *See* Doc. 230, Mot. for Leave; *see also* Doc. 229, Cory's Reply, 6 n.6. Cory also argued that Atherio's Voting Agreement required Preferred Series A Shareholders' approval to remove directors and that O'Connor and Stewart had Preferred Series A shares. Doc. 229 Cory's Reply, 6 n.6. With their surreply, O'Connor and Stewart attach the Written Consent (which Cory did not provide). Doc. 230-2, Defs.' Surreply App., 3–8. They also offer additional arguments explaining why the Voter Agreement and Written Consent do not establish that they had power to vote on Cory's removal. Doc. 230-1, Surreply, 1–3. Cory does not oppose the offering of the Written Consent or arguments related to it; but he does oppose additional arguments related to the Voting Agreement. Doc. 231, Cory's Resp. to Mot. for Leave, 1–2. Because Cory is not opposed, the Court **GRANTS** O'Connor and Stewart's motion for leave (Doc. 230) with respect to filing of the Written Consent and arguments related to it. However, as for the arguments related to the Voting Agreement, the Court **DENIES** their motion for leave because O'Connor and Stewart have addressed those arguments in their summary-judgment briefing. Doc. 224, Defs.' Resp., 8–9.

Written Consent also, as an example, elected directors, O'Connor and Stewart's vote as Preferred Series A shareholders would have been needed to carry out that action. *See* Doc. 224-1, Defs.' Resp. App., 28 ¶ 3 (Voting Agreement noting that Preferred Series A shareholders shall vote on any election of directors). That does not mean their vote was required to remove or effective in removing the existing directors—the votes of the Class A shareholders in the Written Consent accomplished this on their own. All this to say, based on the available evidence, the Court does not find that O'Connor and Stewart were needed to remove Cory from Atherio. And if they were not needed, it makes little sense for Cory to claim that Furst needed and obtained their express authority to remove Cory from the company.

In all, the Court concludes that Cory has not brought forth sufficient evidence to show that O'Connor and Stewart gave Furst their express actual authority to enter into an agreement to remove Cory from the company on their behalf.

It follows then that Cory's next argument—that Furst had the implied authority to release O'Connor and Stewart's claims—also fails because Furst had no express authority to enter into the Omnibus Agreement for them. *Crooks*, S.W.3d at 238 ("An agent who does not have express authority cannot have implied authority."). However, even if the Court assumes that Furst had their express authority, the Court finds that the release provision was not merely incidental to the business Furst was entrusted with—*i.e.*, removing Cory from the company. Thus, it would not have been within Furst's implied authority to enter into on Defendants' behalf.

To succeed on this argument, Cory's evidence needs to show that releasing O'Connor and Stewart's claims against Cory was "proper, usual, and necessary to the exercise of the authority the

principal expressly delegates." *Nears v. Holiday Hosp. Franchising, Inc.*, 295 S.W.3d 787, 795 (Tex. App.—Texarkana 2009, no pet.). Cory argues that Furst had implied authority to enter into the release because: (1) O'Connor and Stewart were aware of the Omnibus Agreement; (2) that O'Connor and Stewart did not object to the negotiations or place any limitation on Furst in securing Cory's removal; and (3) that they got something of benefit out of the release (specifically, indemnification). Doc. 219, Cory's Br. Summ. J., 9–10; Doc. 226, Cory's Resp., 8–9.

The Court does not believe Cory's evidence is sufficient to show implied authority. To start, Furst testified twice that he believed his authority to release O'Connor and Stewart's claims came from their silence. Doc. 226, Cory's Resp., 8 (citing Doc. 220, Cory's App., 32–34, 39–40). When first asked why he believed he had O'Connor and Stewart's authority to sign the Omnibus Agreement on their behalf, Furst testified: "To my prior point, they never objected to any communications we had about how we were handling the settlement." Doc. 220, Cory's App. (Furst Dep.), 33–34. When asked specifically why he believed he had the authority to release their claims, Furst testified: "Well, certainly through the omnibus agreement they did not object to the terms that we were negotiating with Jason through my discussions with them." *Id.* at 39. Cory also cites to evidence that tends to show O'Connor and Stewart knew that the Omnibus Agreement—or at least an agreement whereby Cory and Atherio would sever their relationship—was being negotiated. Doc. 226, Cory's Resp., 8 (citing Doc. 220, Cory's App., 56–57 (O'Connor Dep.).

O'Connor and Stewart do not deny that they knew negotiations were being held between Atherio and Cory regarding his removal. Doc. 228, Defs.' Reply, 1, ¶ 2. Instead, they assert that they believed Atherio was negotiating solely on its behalf, not theirs. *Id.* O'Connor and Stewart stated

that Furst and/or Atherio's lawyer told them they were not allowed to see the document, and this led them to believe the agreement did not involve their rights. Doc. 217-5, Defs.' App., 289–90, ¶ 3 (O'Connor's Decl.), 293–94, ¶ 3 (Stewart's Decl.). They also have stated that they never saw the Omnibus Agreement, let alone the release provision within, before it was executed. *Id.* at 289–90, ¶¶ 3–5, 293–94, ¶¶ 3–5. Finally, they have declared that they never spoke with Furst about a release of claims. *Id.* They do not debate that they never objected to or placed a limitation on Furst's negotiation of the Omnibus Agreement; instead, they argue its "absurd" for them to have thought they needed to do such a thing because they never knew their rights were at stake. *Id.* 290–91, ¶ 7, 294–95, ¶ 7.

Cory has produced no evidence that contradicts these declarations. Instead, Cory would have the Court find that O'Connor and Stewart wanted to be bound by a provision they never knew about or saw because it was "necessary and proper" to carry out his authority to execute the Omnibus Agreement. The Court refuses to do so—there is nothing in the record that supports the argument that a release of Stewart and O'Connor's claims was necessary to execute the Omnibus Agreement. Nor does the Court find that this release was a proper and usual provision that flowed from Furst's purported express authority to enter into an agreement that terminated Cory's employment. This latter point is supported by Texas law. In *Expro Americas, LLC v. Sanguine Gas Exploration, LLC*, Houston's 14th Court of Appeals held that while an agent overseeing the drilling of a well had the express authority to approve necessary services and sign job tickets, the agent did not have the implied authority to execute indemnity provisions, binding on the principal, that were contained in those job tickets. 351 S.W.3d 915, 922–24 (Tex. App.—Houston [14th] 2011). The court of appeals

held that there was not sufficient summary-judgment evidence "support[ing] an inference that execution of indemnity agreements was a necessary and proper facet of [the agent's] responsibilities." *Id.* at 924 (citing *Reliant Energy Servs.*, 336 S.W.3d at 783). The court supported its holding by reasoning that "subjecting [the principal] to massive financial risk of indemnifying [the plaintiff] for its own negligence would not be an ordinary aspect of [the agent's] duty of retaining services and equipment for the project." *Id.* at 923. Similarly here, Cory has not shown the Court evidence that agreeing to release O'Connor and Stewart's claims was necessary to execute the Omnibus Agreement, let alone a usual or proper provision that flowed from his alleged actual authority. To the contrary, like in *Expro*, this release provision in the Omnibus Agreement results in a substantial shift of potential liability and risk. And while it may have been ordinary and proper for Furst to release Atherio's claims as its CEO, the same is not true as to O'Connor and Stewart, who had their own personal claims against Cory. The evidence shows that they never saw the release provision, or the Omnibus Agreement, before it was executed, or spoke to anyone involved in the negotiations about a release. Cory's evidence therefore falls short of creating a fact issue on whether O'Connor or Stewart's conduct or words would have lead Furst to believe he had the implied authority to execute a release of their claims.

To summarize, Cory's evidence is insufficient to create a fact issue as to whether O'Connor and Stewart intentionally conferred upon Furst the authority, or allowed him to believe he had the authority, to release their claims against Cory. His evidence also fails to create a fact issue showing that O'Connor and Stewart allowed Furst to believe, by want of due care, that he had actual authority to enter into the release. In other words, nothing in the record shows that before the

Omnibus Agreement was executed, O'Connor and Stewart were willing to release their claims against Cory and communicated this to Furst. As such, the Court grants summary judgment against Cory on this issue.

### ii. Apparent Authority

Cory next argues that Furst had apparent authority to sign the Omnibus Agreement on O'Connor and Stewart's behalf. Doc. 219, Cory's Br. Summ. J., 10–13. O'Connor and Stewart argue Cory has no evidence that they acted in a way necessary to bestow apparent authority. Doc. 224, Defs.' Resp., 6–10.

Apparent authority "is based on estoppel, arising 'either from a principal knowingly permitting an agent to hold [himself or herself] out as having authority or by a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he or she] purports to exercise." *Gaines*, 235 S.W.3d at 182 (quoting *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998)). "To determine an agent's apparent authority, the court examines the conduct of the principal and the reasonableness of the third party's assumptions regarding the agency's authority." *Kirkindoll v. Nat'l Credit Union Admin. Bd.*, 2015 WL 1636534, at *9 (N.D. Tex. Apr. 13, 2015) (citing *Gaines*, 235 S.W.3d at 183). Importantly, "only the conduct of the principal is relevant." *Id.* (alterations omitted). "Declarations of the alleged agent, without more, are incompetent to established either the existence of the alleged agency or the scope of the alleged agent's authority." *Id.* (quoting *Gaines*, 235 S.W.3d at 183–84).

Thus, for Cory to succeed on his apparent-authority theory, the "[principals O'Connor and Stewart] must have affirmatively held out the agent [Furst] as possessing the authority or must have *knowingly and voluntarily* permitted the agent [Furst] to act in an unauthorized manner." *Id.* at 11 (emphasis in original) (quoting *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996) (per curiam)). O'Connor and Stewart's "full knowledge of all material facts is essential to establish a claim of apparent authority based on estoppel." *Id.* (quoting *Gaines*, 235 S.W.3d at 182). So Cory "must show that [O'Connor and Stewart] had *full knowledge of all material facts at the time of the conduct alleged* to be the basis for the apparent authority." *Id.* (emphasis added) (quoting *Expro Ams.*, 351 S.W.3d at 925). If Cory has not adduced evidence that O'Connor and Stewart "had knowledge of the conduct alleged to constitute the basis of the estoppel, apparent authority cannot be established." *Id.* (collecting cases where there was no evidence principals had knowledge of material facts underlying estoppel theories).

Cory cites to much of the same evidence discussed at length above to support his theory of apparent authority. As far as additional evidence, Cory cites to his own deposition where he testified that he believed that Furst had authority to sign the Omnibus Agreement on behalf of O'Connor and Stewart. Doc. 219, Cory's Br. Summ. J., 12–13 (citing Doc. 220, Cory's App., 45–48 (Cory's Dep.)). Cory also relies on two additional facts: (1) a provision in the Omnibus Agreement that states that "[t]he signatory for each party to this Agreement signing on behalf of each such party acknowledges and warrants that he is fully authorized and legally competent to execute this Agreement . . . and is a duly authorized representative of such party[,]" *id.* at 11 (citing Doc. 220, Cory's App., 16 (Section 18m of the Omnibus Agreement)); and (2) O'Connor's deposition

testimony where she states that it was her belief that Cory was going to indemnify her and Stewart, and that Cory would probably want something for this. Doc. 226, Cory's Resp., 12–13 (citing Doc. 220, Cory's App., 56–57 (O'Connor's Dep.)). Cory further asserts that because O'Connor also knew that "settlement discussions" were going on between Cory and Atherio, *id.* at 12 (citing O'Connor's Dep., 268:7–11), she "wanted" any settlement agreement to include the indemnity obligation. *Id.* (citing to O'Connor's Dep. at 326:6–24, which is almost 60 pages away from the portion she discussed her awareness of settlement talks). To be certain, O'Connor never testified she wanted an indemnity obligation to go in the Omnibus Agreement; instead, Cory makes this inference on his own accord from her deposition testimony. *Id.* at 12.

Considering all of this evidence, Cory has not shown that O'Connor and Stewart had knowledge that the Omnibus Agreement had the effect of releasing their personal claims against Cory. This is fatal to his claim of apparent authority. As discussed at length, the alleged principal must have "full knowledge of all material facts at the time of the conduct alleged" to establish a claim of apparent authority. *Kirkindoll*, 2015 WL 1636534, at *11. And O'Connor and Stewart have introduced uncontroverted evidence that they had no knowledge that Furst was negotiating on their behalf, and not just for Atherio, nor that he was going to release their personal claims against Cory. Doc. 228, Defs.' Reply, 3 (citing Doc. 217-5, Defs.' App., 289–90, ¶ 3 (O'Connor's Decl.), 293–94, ¶ 3 (Stewart's Decl.)). O'Connor and Stewart never saw the Omnibus Agreement before it was executed and never participated in its negotiation. *Id.* at 4. Moreover, Furst himself testified that he would not have discussed the actual release clause or its incorporation in the Omnibus Agreement with O'Connor and Stewart. Doc. 217-5, Defs.' App., 324, 331, 334–35 (Furst Dep.). Without any

evidence that O'Connor and Stewart were at least somewhat aware of the release provision, Cory's apparent-authority arguments fail. *See Coffey v. Fort Wayne Pools, Inc.*, 24 F. Supp. 2d 671, 682–83 (N.D. Tex. 1998) (finding third party could not establish a claim of apparent authority were principal had no knowledge of contracts alleged agent signed until after the contracts were executed); *see also Nears*, 295 S.W.3d at 794 (holding there was no apparent authority were there was "no evidence that [the principal] was made aware of the 'material facts' . . . .").

Further, as stated above, "apparent authority must be based on the acts of the principal." *Gaines*, 235 S.W.3d at 184. Focusing solely on O'Connor and Stewart's conduct directed at Cory, it is undisputed that O'Connor and Stewart never spoke to Cory about the Omnibus Agreement. Doc. 228, Defs.' Reply, 3 (citing Doc. 220, Cory's App., 51 (Cory's Dep.) ("I think I've said numerous times I don't recall having discussion with plaintiffs related to this topic.")). Instead, Cory bases his belief on representations that other parties—not O'Connor or Stewart—made to him. Doc. 220, Cory's App., 45–46 (Cory testifying in his deposition that he believed Stewart had authorized the release of his claims based on representations from his own attorney and Atherio's attorneys). Cory did not testify that any manifestation or conduct on O'Connor or Stewart's part led him to believe that they had given their authority to release their claims. And Cory has brought forth no other evidence of such conduct on their part.

Additionally, Cory's reliance on § 18(m) of the Omnibus Agreement is misplaced. First, as O'Connor and Stewart point out, this is not a representation made by them because they are not parties to the Agreement. Doc. 224, Defs.' Resp., 7–8. The Omnibus Agreement states that it was "made and entered into[,]" "by and among Jason M. Cory ('Cory'), Atherio, Inc., a Delaware

corporation and its Affiliates[4] (sometimes collectively referred to as, 'Atherio'), and Prudent Capital II, L.P., a Maryland limited partnership ('Prudent')." Doc. 217-4, Defs.' App., 256 (Omnibus Agreement). And the Agreement was signed only by: (1) Jason Cory, for himself; (2) Greg Furst, as CEO of Atherio and for Atherio; and (3) Steven Schwartz, as the manager of Prudent and for Prudent. *Id.* at 267–69. Section 18(m) provides that the "signatory for each party *to this Agreement* signing on behalf of each *such party* acknowledges and warrants that he is fully authorized" to execute the Agreement. *Id.* at 266 (Section 18(m)) (emphasis added). Thus, this is not conduct on the part of O'Connor and Stewart; this is a representation by Furst (and the other signatories) that they have authority. Texas courts disregard the conduct of the alleged agents in determining apparent authority. *Gaines*, 235 S.W.3d at 183. Second, this clause has no relation to the Defendants. Furst is warranting that he is signing the Omnibus Agreement with *Atherio's* authority. O'Connor and Stewart did not sign and are not parties to the Agreement. Thus, Cory's argument that O'Connor and Stewart are somehow included in § 18(m), giving Furst apparent authority, does not hold water.

Because he has no evidence of affirmative conduct on O'Connor and Stewart's part, Cory falls back on the argument that O'Connor and Stewart's silence is evidence that Furst had apparent authority. Doc. 229, Cory's Reply, 3–4. But O'Connor and Stewart's lack of knowledge as to any release is also fatal to Cory's argument. It is nonsensical to argue that O'Connor or Stewart should have objected to Furst's execution of the Omnibus Agreement, and specifically the release provision, when they had no knowledge of what was in the Agreement, never saw the Agreement, and did not

---

[4] "Affiliates" is defined in the Omnibus Agreement at § 1(b) and expressly applies to Atherio's related business entities, AI, LLC and AIM, LLC. Doc. 217-4, Defs.' App., 257. It is not alleged that "Affiliates" is meant to include O'Connor or Stewart.

participate in the negotiation of the Agreement. This is not a case like the one Cory cites, *PanAmerican Operating Inc. v. Maud Smith Estate*, where other conduct from the principal in the case clothed the agent in indicia of authority, and thus the principal's silence was, in effect, a manifestation that its agent had authority. 409 S.W.3d 168, 172–73, 175 (Tex. App.—El Paso 2013, pet. denied). The El Paso court described that case as one where the principal "had a formal business relationship with its agent, knew its agent would be contacting third parties *on its behalf* for the express purpose of carrying out its business objectives, and outfitted [the agent] with the tools necessary to accomplish his task." *Id.* at 175 (emphasis added). Thus, the court held that the principal "clothed" the agent "with the indicia of authority he purported to have and on which [the third party] relied by *knowingly failing* to take any action to dissuade [the third party] from believing [the agent] had the authority to bind" the principal. *Id.* at 176. This case is distinguishable. The Court has already found above that there was no evidence that Furst had O'Connor and Stewart's actual authority to act on their behalf. In fact, they believed the Agreement did not concern them at all. Furst was not their employee, and this was not a task he was typically employed by the Defendants to do. *See id.* at 173 (noting that it was undisputed the agent in that case had the authority to execute oil and gas leases and negotiate terms on the principal's behalf).

Thus, Cory has not adduced evidence that based on the conduct of the alleged principals O'Connor and Stewart, they either knowingly permitted Furst to hold himself out as having authority or acted with such a lack of ordinary care as to clothe Furst with indicia of authority. Because of this, the Court finds that Cory's theory of apparent authority also fails.

B.    *Ratification or "Acceptance-of-Benefits" Theory*

Cory's second theory of liability is that O'Connor and Stewart accepted the benefits of the Omnibus Agreement and thus are bound by all of its terms. Doc. 219, Cory's Br. Summ. J., 13–15. O'Connor and Stewart respond that they neither accepted a benefit under this Agreement nor ratified the Agreement. Doc. 224, Defs.' Resp., 12–17.[5]

Texas contract law[6] provides for an equity-based defense termed quasi-estoppel. *Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 770 (Tex. App.—Fort Worth 2010). Quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Id.* (quoting *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000)). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.* "Thus, quasi-estoppel forbids a party from accepting the benefits of a transaction . . . and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Id.* (citing *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied)). However, similar to an apparent-authority claim, Texas courts hold there "can be no ratification or

_____

[5] Additionally, O'Connor and Stewart argue that the Court should grant summary judgment against Cory on this issue because Cory failed to respond to their briefing and arguments. Doc. 228, Defs.' Reply, 10. The Court declines to do so because the Fifth Circuit treats such rulings with disfavor. *See Luera v. Kleberg Cty. Tex.*, 460 F. App'x 447, 449 (5th Cir. 2012) ("We have approached the automatic grant of a dispositive motion, such as a grant of summary judgment based solely on a litigant's failure to respond, with considerable aversion; and we have permitted such dismissals only when there is a record of extreme delay or contumacious conduct." (citing *Ramsey v. Signal Delivery Serv., Inc.*, 631 F.2d 1210, 1214 (5th Cir. 1980))).

[6] The same choice-of-law analysis conducted above applies to this issue. *See supra*, note 1. The Court applies Texas law here as well.

estoppel from acceptance of the benefits by a person who did not have knowledge of all material facts." *Id.* (quoting *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971)).

Similarly, ratification "is the adoption or confirmation, by one with knowledge of all material facts, of a prior act that did not then legally bind that person and which that person had a right to repudiate." *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 195 (Tex. App.—Dallas 2013). "Ratification of a contract occurs when a party recognizes the validity of a contract by acting under it, performing under it, or affirmatively acknowledging it." *Id.* "In other words, a party ratifies a contract by conduct recognizing the contract as valid with knowledge of all relevant facts." *Id.* (citing *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 146 (Tex. App.—Corpus Christi 2006, pet. denied)).

Cory alleges that the Omnibus Agreement provided "various benefits" to O'Connor and Stewart. Doc. 219, Cory's Br. Summ. J., 13. However, like Cory's apparent-authority claim, his quasi-estoppel claim fails because he has no evidence that O'Connor or Stewart had knowledge of all material facts surrounding the negotiation and execution of the Omnibus Agreement. *See* discussion *supra*, pp. 17–20.

Further, the case Cory cites to support his acceptance-of-the-benefits theory is not similar to the case at bar. Cory relies on a Delaware case where the court held that a nonparty to a purchase agreement could be bound by an arbitration clause in that agreement because she knowingly accepted the benefits of the agreement—a computer and its accessories—and "asserted ownership" over those goods. Doc. 219, Cory's Br. Summ. J., 14 (citing *Westendorf v. Gateway 2000, Inc.*, 2000 WL 307369, at *4 (Del. Ch. Mar. 16, 2000)). The Delaware court found that "equity dictates that

plaintiff be bound by the arbitration clause just as someone who actually bought, received and retained the same computer is bound." *Westendorf*, 2000 WL 307369, at *4.

That is not the case here. Cory claims that O'Connor and Stewart should not be allowed to "reap the benefits" of the Omnibus Agreement while disclaiming the terms they disfavor. Doc. 219, Cory's Br. Summ. J., 14. But Cory has not brought forth any evidence showing that O'Connor or Stewart availed themselves of any benefit from the Omnibus Agreement. For example, Cory argues that an indemnification clause in the agreement requires Cory to indemnify O'Connor and Stewart from any damages resulting from Cory's bad acts while working for Atherio, *id.* at 14–15; but Cory has not shown that O'Connor or Stewart ever sought or received money via this provision. *See* Doc. 224, Defs.' Resp., 13–14. Cory asserts that because O'Connor and Stewart cited to the indemnification provision in previous summary-judgment briefing on the nonreliance-clause issue, they attempted to avail themselves of the provision. Doc. 219, Cory's Br. Summ. J., 15. The Court disagrees—O'Connor and Stewart cited the provision as an alternative argument for why the Court should not permit Cory to supplement his nonreliance defense with terms from the Omnibus Agreement. *See* Doc. 63-1, Pls.' Br. Mot. for Partial Summ. J., 9–10; Doc. 101, Reply, 8–9. O'Connor and Stewart did not attempt to affirmatively avail themselves of the indemnification provision and then disclaim any liability under the Omnibus Agreement. Rather, what they asserted there is entirely consistent with what they are asserting now—that the Omnibus Agreement did not release their claims against Cory. Without any evidence that they *knowingly* accepted the benefits of this provision—*i.e.*, indemnification—the Court finds that Cory is not entitled to equitable or quasi-contractual relief based on this argument. *See Clark*, 327 S.W.3d at 770

Cory's claim that O'Connor and Stewart similarly benefitted from a pari passu provision in the Omnibus Agreement also fails. Doc. 219, Cory's Br. Summ. J., 14. According to Cory, this provision was inserted to benefit O'Connor and Stewart because it required Atherio to pay out Cory pari passu with, or at the same rate as, money owed to O'Connor and Stewart under the terms of another agreement. *Id.* (citing § 5 of the Omnibus Agreement). But Cory's only evidence supporting his assertion that O'Connor and Stewart received a benefit under this provision is (1) testimony from Furst that "[t]here was a lot of discussion about this term" and (2) testimony from Cory that someone told him during negotiations that the term was needed to make O'Connor and Stewart feel comfortable. *Id.* (citing Doc. 220, Cory's App., 34–38, 49–51). Neither of these statements supports Cory's argument because neither shows that O'Connor or Stewart knew about the Omnibus Agreement or this provision. Nor does the testimony show that O'Connor or Stewart availed themselves of this provision by demanding payment or receiving payment pursuant to it.

Finally, Cory argues that the Omnibus Agreement benefitted O'Connor and Stewart because it removed Cory from Atherio and has protected them against any potential suits from Cory based on a covenant-not-to-sue provision. *Id.* at 14–15. Again, this is not a benefit O'Connor and Stewart directly attempted to avail themselves of or a provision they attempted to ratify; this is merely an occurrence between Atherio and Cory that resulted in an incidental benefit to them. Moreover, Cory's argument that O'Connor and Stewart benefitted from his covenant not to sue them is purely hypothetical because Cory has not shown that they invoked this provision as a defense to any claim Cory brought against them.

The Court thus finds that Cory has not brought forth any evidence that supports his claim that O'Connor and Stewart should be held liable under the Omnibus Agreement because they accepted some benefit under it or ratified it. Because both of Cory's theories of liability fail as a matter of law, the Court finds that O'Connor and Stewart are not bound by the Omnibus Agreement and grants summary judgment in their favor. The Court does not reach Cory's arguments that O'Connor and Stewart breached the release provision and that he was harmed by this breach. *See* Doc. 219, Cory's Br. Summ. J., 15–17.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment (Doc. 216) and **DENIES** Plaintiff's motion for summary judgment as to liability (Doc. 218). Further, as specified in footnote three, *supra*, the Court **GRANTS in part** and **DENIES in part** Defendants' motion for leave to file a surreply (Doc. 230). Because this memorandum opinion and order disposes of the remaining issues in this case, a final judgment will follow. All other pending motions and deadlines in this case are terminated.

**SO ORDERED.**

**SIGNED: MAY 8, 2019.**

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE